STATE OF CONNECTICUT *v.* HERIBERTO LOPEZ
(15320)

Peters, C. J., and Callahan, Berdon, Norcott and Katz, Js.

Argued April 24—officially released August 20, 1996

*Lauren Weisfeld*, assistant public defender, with whom was *Christopher DeMarco*, assistant public defender, for the appellant (defendant).

*Jack W. Fischer*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Gary W. Nicholson*, assistant state's attorney, for the appellee (state).

KATZ, J. The sole issue in this certified appeal is whether the Appellate Court properly upheld the trial court's decision to exclude the confession of a third party. We conclude that the trial court abused its discretion in failing to determine that the third party declarant was unavailable and, because the trial court did not decide whether her statement was trustworthy, we remand the case for further proceedings.[1]

---

[1] As a result of our conclusion, we need not consider today whether the exclusion of that evidence deprived the defendant of his constitutional right to due process of law. See *State* v. *Gold*, 180 Conn. 619, 639 n.10, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980).

The defendant, Heriberto Lopez, was charged with murder in violation of General Statutes § 53a-54a,[2] conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48,[3] and having a weapon in a motor vehicle in violation of General Statutes § 29-38.[4]

[2] General Statutes § 53a-54a provides: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

[3] General Statutes § 53a-48 provides: "Conspiracy. Renunciation. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[4] General Statutes § 29-38 provides: "Weapons in vehicles. Any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. The word 'weapon', as used in this section, means any pistol or revolver, any dirk knife or switch knife or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, and any other dangerous

Following a jury trial, he was convicted of all three counts, and a total effective sentence of forty-five years imprisonment was imposed. The defendant thereafter appealed to this court and, pursuant to Practice Book § 4023 and General Statutes § 51-199 (c), we transferred the appeal to the Appellate Court, which affirmed the judgment of the trial court. *State* v. *Lopez*, 38 Conn. App. 434, 435, 662 A.2d 792 (1995). The Appellate Court held, inter alia, that the trial court's exclusion of an out-of-court statement that allegedly was the confession of a third party was not improper. Id., 436–39. The defendant thereafter petitioned this court for certification to appeal, which we granted.[5]

The opinion of the Appellate Court sets forth some of the relevant facts that the jury reasonably could have found. "On May 8, 1991, at approximately 7:30 p.m., the victim, Elvis Crnkovic, and his brother Paul Crnkovic, were playing basketball at the corner of Winthrop and Davenport Avenues in New Haven. Elvis, who was sixteen years old, and Paul, who was seventeen years old, lived across the street from a vacant building on which a basketball rim was nailed. While they were playing, a brown car drove up with the defendant in the front passenger seat holding a .38 caliber revolver. A second car, a gray Mazda, also approached. The Mazda was driven by Jorge Orta, and David Morales was a passenger. Shots were fired from both cars and Elvis was hit

or deadly weapon or instrument, including any slung shot, black jack, sand bag, metal or brass knuckles, stiletto, knife, the edged portion of the blade of which is four inches or over in length or martial arts weapon as defined in section 53a-3. The provisions of this section shall not apply to any person enrolled in and currently attending a martial arts school, with official verification of such enrolment and attendance, having any such martial arts weapon in a vehicle while traveling to and from such school."

[5] We granted the defendant's petition for certification to appeal limited to the following issue: "Whether the Appellate Court properly upheld the trial court's exclusion of a third party confession?" *State* v. *Lopez*, 235 Conn. 919, 665 A.2d 907 (1995).

in the back as he and his brother attempted to run away. The bullet was a 'hollow point' that entered his lower back and came to rest just beneath the skin of his left collarbone. Elvis was taken to the hospital where he died as a result of his wounds. The defendant was one of the shooters."[6] Id., 436.

One of the state's key witnesses at trial was Lenise Nestir, who testified on May 13 and 14, 1993.[7] Nestir testified that she had been in the Liberty Street area prior to the shooting, and that she had seen Alex Romero drive up in a brown vehicle. According to Nestir, Romero, who claimed to have had a gun in his possession, asked whether anyone wanted to accompany him to Davenport Avenue. Nestir explained that there was a group of young people in the Liberty Street area that did not get along with another group of young people that congregated in the Davenport Avenue area. Nestir testified that the defendant accompanied Romero and that, although she declined Romero's invitation to get into the car, she walked to within one block

---

[6] The state introduced testimony to establish that the defendant had been a member of the Davenport Avenue gang and that the shooting was part of an ongoing feud between the defendant's gang and the "Liberty Street Posse." First, Lenise Nestir, followed by Perry Moore and Ivanez Virvet, three eyewitnesses to the shooting, testified about the "bad blood" that existed between the two gangs. Paul Crnkovic also testified that a few weeks before the shooting, he was "jumped" by Morales. When interviewed by Detective Ralph Dinello, the defendant admitted to being at the scene in the gray car and stated that Alex Romero, who was in the brown car, had been the shooter. At trial, however, the defendant denied having made those statements and denied any participation in the shooting. During the presentation of the state's case, the defendant attempted to establish that Orta and Morales had killed Elvis in retaliation for an earlier shooting of Orta for which the Liberty Street Posse believed the Davenport Avenue gang to have been responsible.

[7] According to the prosecutor in the present case, Nestir was to be in the New London courthouse on May 14 for sentencing in an unrelated matter. In order to allow for Nestir's testimony to be concluded without interruption, the prosecutor arranged for her sentencing to be continued for one week, until May 21.

of the shooting in order to be a spectator. Although she claimed to have been on friendly terms with the victim's family, Nestir failed to warn the Crnkovic brothers, who were outside playing basketball, of the impending danger.

When Nestir reached the intersection of Winthrop and Davenport Avenues, she saw Romero's brown car approach, heading eastbound on Davenport Avenue. Because the car passed by so quickly, she could not identify its occupants and could only see shots being fired from within that vehicle. Although the state introduced evidence that there also was a gray car at the scene from which shots had been fired, Nestir testified that she never saw a gray car.[8] She learned later that Elvis had died as a result of that shooting.

Soon after the shooting, Nestir saw Romero driving a vehicle with the defendant and another male named Andrew as the vehicle approached a nearby dumpster, where Nestir witnessed Andrew empty shells from a gun into the dumpster. Later that same day, Romero gave the gun to Nestir to dispose of it. Instead of discarding it, Nestir testified that she kept the gun, hoping to exchange it for a car. Subsequently, the New Haven police, who had been notified of the proposed transaction, seized the gun from her but never charged her with an offense.

The defendant had intended to call Nestir as his first witness at the conclusion of the presentation of the state's case-in-chief. On Friday, May 14, 1993, Nestir's second day of testimony as a state's witness, the defendant subpoenaed Nestir to appear in court on Monday, May 17, 1993. When she failed to appear on May 17, the state represented to the court and the defendant

---

[8] Although she denied having seen a gray car at the scene of the homicide, Nestir testified that she had seen Orta and Morales in a gray car after the shooting.

that Nestir's mother, Sophie Nestir, had contacted the state's attorney's office and had stated that she had not seen her daughter the entire weekend. The defendant subsequently sought, and was granted, a capias.

On May 19, when the state rested its case, the defendant notified the court that the capias had not been served. Rather than calling Nestir to testify, therefore, the defendant began his defense by calling another witness. Toward the end of the day, the defendant notified the court, outside the presence of the jury, that the sheriff had been unable to locate Nestir at her mother's home—445 Poplar Street in New Haven—in order to serve the capias. The defendant then called Robin Shade, a close friend of Nestir, to make an offer of proof, hoping that the court would allow Shade to testify regarding incriminating statements that Nestir had made to her.

Shade testified that one and one-half days after the shooting, Nestir had told her about Elvis' killing. Nestir had told Shade that Paul Crnkovic, Elvis' brother, had hit Nestir in the face. Nestir remarked to Shade that she was going to retaliate by "get[ting] some boys from Liberty Street to beat his butt." Shade further testified that Nestir told her that on the day of the incident, Nestir and "some boys from Liberty Street" drove down Davenport Avenue and saw Paul and Elvis playing basketball. According to Shade, Nestir had stated that she "got a car full of guys and she said that one of them had the gun shooting it out the window up to the sky and she grabbed it from the guy and pointed it to Paulie and it didn't hit Paulie it hit someone else and she said it was his brother."

At the time of her testimony, Shade had known Nestir for nine years. Although they were not actually related, Nestir referred to Shade as her aunt. Shade took care of Nestir eight years earlier, one time for nine months

and another time for eleven months. She stopped taking care of Nestir because Nestir "like[d] to go on the streets constantly." Shade testified that Nestir had been a poor influence on her daughters and had involved them in some petty criminal behavior. Furthermore, upon questioning Nestir about these episodes, she sometimes caught Nestir telling lies. Even after Nestir no longer lived with Shade, she continued to visit Shade's home, and came often during 1993. Shade believed that she knew Nestir well and that she knew when Nestir was telling the truth and when she was lying.

At the conclusion of this offer of proof, which constituted the defendant's first attempt to get Shade's testimony into evidence, the state argued, in reliance on recent cases[9] from this court outlining the requirements for introducing third party statements against penal interest into evidence, that "even if the court should find that Miss Nestir is unavailable . . . [t]his kind of statement is clearly completely unreliable . . . [because Shade] couldn't trust anything that she said . . . ." The defendant argued in response that, based on cases addressing the admission of third party exculpatory evidence; see, e.g., *State* v. *Boles*, 223 Conn. 535, 548–49, 613 A.2d 770 (1992); he did not need to establish the unavailability of the declarant and therefore had not focused on whether Nestir was unavailable. The court concluded that it would leave the issue of the declarant's reliability for the jury to decide and focused instead on the unavailability prong of the test, concluding that "in light of her having testified here . . . the court is of the opinion that it cannot make a finding that [Nestir] is unavailable . . . ." Following the court's ruling, the defendant acknowledged his burden of prov-

[9] See, e.g., *State* v. *Duntz*, 223 Conn. 207, 229–30, 613 A.2d 224 (1992); *State* v. *Gold*, 180 Conn. 619, 630–31, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *DeFreitas*, 179 Conn. 431, 441–45, 426 A.2d 799 (1980).

ing the declarant's unavailability and sought additional time "to have the sheriffs once again try to locate and serve the capias and effect a capias upon Miss Nestir and if that's—if they are incapable of doing that, then I would put on the showing of unavailability and then offer Miss Shade after that . . . ."

The defendant proceeded with additional witnesses and, following the afternoon recess on May 20, advised the court that he had "not had any luck in getting the capias [executed] nor this court's order authorizing the arrest of Miss Nestir. I delivered it or the sheriff took possession of it on Monday [May 17] when the order was entered. It was not received by a deputy sheriff for service until Wednesday [May 19]. That sheriff went to 445 Poplar Street, attempted to serve Miss Nestir, she was not there. The deputy sheriff returned here and informed me of that much and left the capias back downstairs at the sheriff's office. I picked it up again at the end of the day yesterday and took it back to my office with me. I called Deputy Sheriff [Harold] Pepper last night. He has not returned my call. I called him two or three times this morning and again at the break advising him to come to the courthouse and pick up this court's order to arrest Miss Nestir and he has not been here. I can't get anyone to [execute] the order issued by this court on Monday." He added that he had taken it downstairs to the sheriff's office but had been told to "look through the Rolodex and find a sheriff who will serve it." The defendant asked the court to help effectuate the order. Because the sheriff's department was apparently concerned about the possibility of keeping Nestir overnight, the defendant asked the court to order the police department, which could more easily house Nestir and bring her to court the next morning, to serve the capias. The court did not believe that it had the authority to order the police to take Nestir into custody.

The defendant further explained that he had given the capias to the sheriff who "mailed it to someone. That person ended up leaving the capias there overnight. I took it back in my possession. The person who was supposed to be serving it, Deputy Pepper, hasn't returned six of my phone calls."[10] When informed by the state that inspectors from the public defender's office were used to serve capiases, the defendant responded: "I can't use them because the public defender's office has a conflict in this case. That's why I'm in on it. So what I'm doing is I'm begging the court—this is an order from Your Honor. This is issued from you, judge." The court expressed frustration, but refused to declare Nestir unavailable. Rather the court suggested that the defendant have the sheriff select another deputy and again try to serve the capias.

The defendant then informed the court that Shade had heard from Nestir and Nestir's mother following Shade's testimony and that Nestir had threatened Shade's life. The defendant sought to present Louis Spina, a private investigator, to testify about a conversation that he had had with Nestir's mother the previous evening. Although the testimony would have pertained to Nestir's unavailability, the trial court refused the defendant the opportunity to put Spina on the stand, concluding that "[i]t may be germane at some point. At this point it is not." Defense counsel, obviously extremely frustrated by the situation, asked to be appointed as an "indifferent person" to effectuate the capias. The court continued to suggest that the defendant do more by way of the sheriff's department to effectuate the order of the court.

On Friday, May 21, the attempts to locate Nestir continued. Defense counsel represented to the court that

---

[10] The capias did not have a return of service attached to prove that the sheriff had attempted service.

his law partner had contacted the New Haven police department, where he had delivered the capias for Nestir, but that the police did not yet have her in custody. Accordingly, he requested a continuance to allow the police to arrest Nestir over the weekend. The state reminded the court, however, that that was the day that Nestir was to be in the New London courthouse for sentencing on an unrelated matter.[11] The defendant asked for confirmation of that fact by the prosecutor who the week before had arranged to have the New London case continued to May 21 to allow Nestir to finish her testimony in the state's case-in-chief. The court denied the request for a continuance.[12]

The defendant then recited for the record the history of his attempts to have Nestir brought to court. Although this recitation is perhaps repetitive, the defendant's efforts bear repeating. He began with the subpoena, followed by the issuance of the capias. The defendant then explained: that the capias had been given to Deputy Sheriff Frank Kinney on May 17; that on May 19, Deputy Sheriff Pepper of Seymour received the capias, which had been mailed to him by the sheriff's office in New Haven; that Pepper went to 445 Poplar Street and returned the capias to the sheriff's office in New Haven because he had been unable to locate Nestir at that address; that the defendant's counsel went to the sheriff's office at approximately 4:45 p.m. on May

---

[11] See footnote 7 of this opinion.

[12] "[Defense Counsel:] What I'm doing is requesting a continuance to find Miss Nestir and if [the state] has confirmation of the fact that she is being sentenced today I will certainly take that information and perhaps Your Honor can request that a capias issue out of that courthouse and Miss Nestir can be arrested there and transported.

"The Court: You're going to have to do more work than has been done. You were here in court when this court asked the state's attorney to see if he couldn't do something about continuing her case next week and it was confirmed that her case had been continued for one week.

"I presume she was over at New London this morning. If she was and you haven't investigated, I'm not about to give you a continuance for that . . . ."

19 and was told that that office would not attempt service after 5 p.m.; that the defendant's counsel then took the capias back and telephoned Pepper six times, receiving no word back from him that day; that the defendant then telephoned Spina to ask him to locate Nestir; that Spina spoke with Nestir's mother who informed him that she had telephoned the state's attorney's office on May 17 regarding her daughter's attendance in court and that Nestir's mother had been told that Nestir's presence that day was not required;[13] that Spina advised Sophie to have Nestir in court on May 20, before 10:30 a.m.; that the defendant's counsel then telephoned Pepper several times on May 20, and that when he received no response, he asked Kinney for assistance; that Kinney advised him to use another sheriff; that the defendant's counsel then asked the court for assistance in effectuating its order, which request the court refused; that he then had Shade available to testify regarding the threats that Nestir had made against her; and that the defendant's counsel advised the court of his inability to use the public defender's office to serve the capias. At the conclusion of this recitation, the defendant asked for a continuance and for a search and seizure warrant to be issued, as was done in the case of another state's witness, Ivanez Virvet, who, following her arrest in her home after she had failed to honor a subpoena, subsequently testified for the state. The court left open the issue of a search warrant, indicating that the court would decide that question when and if presented with a warrant in proper form.

The court then questioned the defendant about whether the decision not to ask Nestir about her statements to Shade while she had been in court on May

[13] The assistant state's attorney testified that he did not tell Sophie Nestir that her daughter's presence was not required that day, just that he did not believe that she would be called that day to testify as a witness.

13 and 14 had been tactical. Furthermore, the court expressed concern, for the first time, about the trustworthiness of Nestir's statement to Shade in light of Shade's characterization of Nestir as a liar.[14] The court never decided whether Nestir's possession of the murder weapon provided a significant connection to the crime as to constitute corroboration of the statement to Shade, although it certainly recognized the significance of that evidence. The defendant responded that he did not have any knowledge of Nestir's admission to Shade until after Nestir had testified for the state. Specifically, the defendant stated that at the time of his cross-examination of Nestir, "I was not presented with Miss Shade's information."[15] The court responded that "as far as I'm concerned she was here . . . last week and you had ample opportunity."

Thereafter, in the presence of the jury, the defendant called Shade, who was permitted to testify only that Nestir had lived with her for extended periods of time,

---

[14] The trial court stated: "Even arguendo, if [Nestir] were found to be available or unavailable, pardon me, and her possession of the murder weapon eight days after the event is a significant connection to the crime, which it may or may not be, the testimony by Miss Shade was unequivocal that [Nestir] was decidedly untrustworthy in her eyes. And so there's a matter of untrustworthiness even if you get past the fact that she seems to be available. . . . The conclusion I reach is that [Nestir] (A) is available and that (B) if she were unavailable the trustworthiness [of her alleged statement] is seriously, seriously in doubt. I leave it unanswered as to whether or not her having the murder weapon in her possession eight days later is or is not a significant connection to the crime. At this point, I'm not ruling on that. I will deny your request for a continuance. Under [State v. DeFreitas, 179 Conn. 431, 451, 426 A.2d 799 (1980)] I find that I cannot find that the witness is unavailable under the circumstances in this case."

[15] The defendant stated more than once that he did not know about Nestir's statement to Shade at the time he subpoenaed Nestir. His additional comments that any examination of Nestir regarding the statement to Shade would have been outside the scope of his direct examination was clearly offered not as an alternative explanation of why he had not questioned Nestir when she was on the stand but, rather, was an explanation of why he would have to call her to the stand to "properly put [the statement] before the court."

that she knew Nestir very well, and that she was able to determine when Nestir was lying to her and when Nestir was being truthful based upon Nestir's behavior and body language.[16] No evidence pertaining to Nestir's statement to Shade was permitted.

Finally, near the end of the day, the defendant presented Robert Sisson, an investigator in the public defender's office, who testified that after having conducted a computer search of all pending criminal matters throughout the state, he found nothing pertaining to Nestir. All criminal matters against Nestir had been disposed of prior to the trial in the present case. Sisson also telephoned the public defender's office at the New London courthouse and learned that Nestir was not on any client list to appear in court. In fact, the public defender's office in New London had never heard of her. When the defendant asked the state whether the criminal matter for which Nestir was to be sentenced on that day was on the youthful offender docket, the

---

[16] On direct examination, Shade testified as follows:

"[Defense Counsel]: [W]ere there times when Miss Nestir would tell you the truth?

"[Shade]: Yes.

"Q. [W]ere there times when Miss Nestir would not tell you the truth?

"A. Yes.

"Q. How could you tell the difference?

"A. The way she acts.

"Q. Describe that for me please.

"A. She would throw herself on the chair; she would slouch down; she would play with her hands, look down or else she would go like this; she would uh-huh and she would talk to herself; she said no, no, then she will say you don't have to know anything.

"Q. Is that when she is telling the truth?

"A. No, that's when she's lying.

"Q. You know that?

"A. Yes, I sure do.

"Q. So you feel that you can tell when Miss Lenise Nestir is telling you the truth and when she is lying?

"A. Yes, sir."

The trial court never revisited whether Nestir's statement to Shade, in light of Shade's testimony, was trustworthy.

court responded that it was the defendant's responsibility to locate Nestir and not the state's.[17] The court then concluded that it would not reconsider its determination that Nestir was not unavailable, and it denied the defendant's request for a continuance until Monday, May 24. With no other witnesses, the defense rested.

The state then announced that its three rebuttal witnesses were currently unavailable. The court continued the case until May 24 and indicated that it would consider allowing the defendant to reopen its case at that time if Nestir should appear. On Monday, May 24, Nestir was not present but the defendant had further information to offer in connection with his attempts to locate her. The defendant asked to call Sergeant Carol Marci of the New Haven police department to the stand to explain the attempts the police department had made to locate Nestir. The court denied the request, and denied the defendant the opportunity to make a record regarding those attempts to locate Nestir, concluding that those efforts were not "sufficiently probative."

The law regarding the admissibility of third party statements against interest is well settled. "A *trustworthy* third party statement exculpatory of the accused and against the penal interest of the declarant is admissible at the trial of the accused if the declarant is unavailable. *State* v. *Boyd*, 214 Conn. 132, 138, 570 A.2d 1125 (1990); *State* v. *Mayette*, 204 Conn. 571, 576, 529 A.2d 673 (1987); *State* v. *Hernandez*, 204 Conn. 377, 389–90, 528 A.2d 794 (1987); *State* v. *Bryant*, 202 Conn. 676,

[17] "[Defense Counsel:] I do have a further question I think I have to ask of [the state] as to whether or not—I don't need to call them but I [would] like to know whether or not this pending matter is a [youthful offender] offense.

"The Court: If you're looking for this lady you're going to have to do the investigation. You're going to have to find out. You knew a week ago that her case was continued over there. You know this is kind of last minute here. I'm not sure that [the state] is responsible for your inquiry as to the whereabouts of this young lady."

692, 523 A.2d 451 (1987); *State* v. *Gold*, 180 Conn. 619, 630, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *DeFreitas*, 179 Conn. 431, 450–51, 426 A.2d 799 (1980); see also Fed. R. Evid. 804 (b) (3). The determination of whether such a statement is sufficiently trustworthy to be admitted into evidence at trial lies within the sound discretion of the trial court. *United States* v. *Hoyos*, 573 F.2d 1111, 1115 (9th Cir. 1978); *State* v. *Mayette*, supra, 577; *State* v. *Hernandez*, supra, 390; *State* v. *Bryant*, supra, 694; *State* v. *DeFreitas*, supra, 452.

"Our present rule allowing the admission of trustworthy third party statements against penal interest has its genesis in *Chambers* v. *Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). Prior to *Chambers*, such third party statements were per se inadmissible as hearsay. *State* v. *Stallings*, 154 Conn. 272, 287, 224 A.2d 718 (1966); *State* v. *Mosca*, 90 Conn. 381, 387, 97 A. 340 (1916); *State* v. *Beaudet*, 53 Conn. 536, 551, 4 A. 237 (1886). In *State* v. *DeFreitas*, supra, [179 Conn. 449], we interpreted *Chambers* as forbidding the mechanistic application of the hearsay rule to exclude all third party statements against penal interest exculpatory of an accused. We concluded, however, that *Chambers* did not mandate the admission of every such statement but required the admission only of those statements that, after a careful examination, were determined in the sound discretion of the trial court to be trustworthy. *State* v. *DeFreitas*, supra, 451–52.

"Four considerations have been deemed relevant when examining the trustworthiness of declarations against penal interest: (1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; [and] (4) the availability of the declarant as a witness. *United States* v. *Guillette*,

547 F.2d 743, 754 (2d Cir. [1976]), cert. denied, 434 U.S. 839, 98 S. Ct. 132, 54 L. Ed. 2d 102 [1977]. See *United States* v. *Oropeza*, 564 F.2d 316, 325 (9th Cir. [1977]) [cert. denied, 434 U.S. 1080, 98 S. Ct. 1276, 55 L. Ed. 2d 788 (1978)]; *Henson* v. *United States*, 399 A.2d 16 [19] (D.C. App.) [cert. denied, 444 U.S. 848, 100 S. Ct. 96, 62 L. Ed. 2d 62 (1979)]; *People* v. *Foster*, 66 Ill. App. 3d 292, 294–95, 383 N.E.2d 788 [1978]. *State* v. *DeFreitas*, supra, [179 Conn. 451]; *State* v. *Bryant*, supra, [202 Conn. 693]; *State* v. *Frye*, 182 Conn. 476, 479, 438 A.2d 735 (1980); *State* v. *Gold*, supra, [180 Conn. 633]." (Emphasis in original; internal quotation marks omitted.) *State* v. *Rosado*, 218 Conn. 239, 243–45, 588 A.2d 1066 (1991).

In deciding whether these principles were properly applied, the focus of our review is on the decision of the Appellate Court that the trial court properly had excluded Nestir's statement. See *State* v. *Torrence*, 196 Conn. 430, 433, 493 A.2d 865 (1985). The Appellate Court based its decision on its determination that the trial court had found that Nestir's statement was not trustworthy. Although the Appellate Court noted that the trial court had found that Nestir was not unavailable, it did not determine the propriety of that decision. *State* v. *Lopez*, supra, 38 Conn. App. 438 n.5. Our review of the record demonstrates that the trial court focused almost exclusively on the issue of Nestir's unavailability, and did not expressly make a finding on the trustworthiness of the statement. Because we conclude that the Appellate Court abused its discretion by engaging in a de novo review to conclude that Nestir's statement was not trustworthy, and because we conclude that the trial court abused its discretion in deciding that she was not unavailable, we remand the case for a determination by the trial court on the issue of trustworthiness.

After Shade testified in connection with the defendant's first offer of proof, the trial court suggested that

Nestir's statement was not trustworthy but made no specific findings to support that suggestion. Moreover, the court expressly left unanswered whether Nestir's possession of the murder weapon served as sufficient corroboration, pursuant to *State* v. *Gold,* supra, 180 Conn. 633, of the trustworthiness of her statement. See footnote 14 of this opinion. Thereafter, each time the defendant made any requests in connection with the introduction of Nestir's statement, the court addressed only the efforts he had made to procure her presence. As the Appellate Court recognized: "The trial court made no findings relative to the first two factors [in determining whether a third party statement is trustworthy] . . . . Although the record might be sufficient to determine when such a statement may have been made and to whom, it is not sufficient to determine whether the person to whom the statement was made was one in whom the declarant would naturally confide . . . whether Nestir and Shade had a close and confidential relationship . . . and whether corroborative evidence existed that was more than a minimal amount or speculative in nature." (Citations omitted.) *State* v. *Lopez,* supra, 38 Conn. App. 438–39. Indeed, because as the record amply demonstrates, the trial court had focused almost exclusively on the issue of Nestir's unavailability, concluding that the defendant had not proved that she was unavailable, the trial court did not need to decide whether Nestir's statement was trustworthy. On the record before it, therefore, the Appellate Court could not properly have determined whether the trial court had abused its discretion in connection with the trustworthiness aspect of Nestir's statement. Only by conducting a de novo review was the Appellate Court able to conclude that the trustworthiness component of the *Gold* analysis had been satisfied. See *State* v. *Marquis,* 235 Conn. 659, 661–62, 668 A.2d 710 (1995); *State* v. *Mayette,* supra, 204 Conn. 579–80; see also Practice Book § 4061.

We, nevertheless, could affirm the Appellate Court's judgment if the trial court's determination regarding Nestir's unavailability had been proper. The Appellate Court, however, never reached that issue. Although we could remand the case to that court for an initial determination, because the record is clear, we will examine it ourselves. Our examination of the record in this case leads us to conclude that the trial court abused its discretion in failing to decide that Nestir was unavailable.

The state has never contested that the statement Nestir allegedly made to Shade was against her penal interest.[18] The conflict about the admissibility of her statement centered predominately around the issue of Nestir's unavailability. Requiring that the unavailability of the declarant be established in order to admit a hearsay statement fulfills the necessity factor that is part of any exception to the hearsay rule. *State* v. *Aillon*, 202 Conn. 385, 390, 521 A.2d 555 (1987); *State* v. *DeFreitas*, supra, 179 Conn. 440. The most common forms of unavailability are set out in rule 804 (a) of the Federal Rules of Evidence.[19] We have previously decided to

---

[18] Rule 804 (b) (3) of the Federal Rules of Evidence provides: "Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

[19] Rule 804 (a) of the Federal Rules of Evidence, entitled "Hearsay Exceptions; Declarant Unavailable," provides: "Definition of unavailability. 'Unavailability as a witness' includes situations in which the declarant—

"(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

"(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or

"(3) testifies to a lack of memory of the subject matter of the declarant's statement; or

employ those definitions "in determining the unavailability of a [declarant] where the admissibility of statements against . . . interest is in issue." *State* v. *Frye*, supra, 182 Conn. 482. In this case, the defendant claims that he has established Nestir's unavailability under subdivision (5) of rule 804 (a). We agree.

In describing what the proponent of the hearsay exception must do to fall within rule 804 (a) (5), we have stated that "[d]ue diligence to procure the attendance of the absent witness [is] . . . an essential . . . predicate of unavailability." *State* v. *Weinrib*, 140 Conn. 247, 252, 99 A.2d 145 (1953). To take advantage of the hearsay exceptions requiring unavailability, the proponent must show a good faith, genuine effort to procure the declarant's attendance by process or other reasonable means. *State* v. *Rivera*, 220 Conn. 408, 411, 599 A.2d 1060 (1991); *State* v. *Frye*, supra, 182 Conn. 484. This showing necessarily requires substantial diligence. In determining whether the proponent of the declaration has satisfied this burden of making reasonable efforts, the court must consider what steps were taken to secure the presence of the witness and the timing of efforts to procure the declarant's attendance. We conclude that, unlike cases in which unavailability was not established; *State* v. *Frye*, supra, 483 (no capias, request for continuance or request of court or state for assistance); the defendant in the present case "exercise[d] a reasonably diligent attempt to serve an absent witness." Id., 483–84.

---

"(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

"(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b) (2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means.

"A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying."

It is evident from the record that Nestir was clearly not eager to cooperate with the defense. During cross-examination, she admitted that although she had spoken with the state's attorney and his investigator, she would not speak with the defense counsel prior to trial. Nestir provided various excuses for avoiding defense counsel, including that she would not talk with defense counsel without her mother's presence, and that she had lost his business card. Nestir conceded, however, that she had made no efforts to obtain defense counsel's telephone number from the defendant's mother, whom she acknowledged was her friend. Although proof of a witness' reluctance to come to court voluntarily is not enough to establish unavailability; see *Bartruff* v. *State*, 528 N.E.2d 110, 115 (Ind. App. 1988); the defendant in the present case made several good faith efforts to procure the declarant by process or other reasonable means. *State* v. *Aillon*, supra, 202 Conn. 391–92.

After Nestir had testified for the state on May 14, and the defendant had learned of her admission to Shade, Nestir failed to honor the defendant's subpoena. She did not return to her mother's home and her only contact was to make telephone calls to Shade threatening Shade not to discuss what Shade had learned from her about the killing. Additionally, because the defendant was not aware of the statement Nestir had made to Shade until after Nestir had testified for the state, the state cannot seriously contend that Nestir's unavailability resulted from the defendant's tactical choice not to question her when she was testifying on May 13 and 14 as a state's witness. Compare *State* v. *DeFreitas*, supra, 179 Conn. 444–47 (because declarant's unavailability resulted solely from defense's tactical strategy, defense could not contend that declarant was unavailable). The defendant's several attempts over a seven day period to serve the capias and to have Nestir arrested to ensure her testimony were frustrated by reasons

beyond his control, including the refusal of the sheriff's department to respond on several occasions, the refusal of the court to grant additional time to have the capias served, and the refusal of the court to allow the introduction of evidence of the efforts the police department had made to serve the capias.

The efforts made in the present case are similar to the attempts made in *State* v. *Dillon*, 191 W. Va. 648, 447 S.E.2d 583 (1994). In that case, the state had subpoenaed the declarant to testify at trial. Id., 659. Although she appeared in court on the first day of trial, the declarant was not called to testify that day and she did not return. "[T]he State ordered several policemen to locate her, but the police were unsuccessful." Id. Despite the issuance of a capias by the court, the state could not procure the declarant's attendance. Consequently, the trial court deemed her unavailable and that finding was affirmed by the Supreme Court of West Virginia. Id.; see also *Foreman* v. *State*, 321 Ark. 167, 174–75, 901 S.W.2d 802 (1995) (unavailability properly determined based upon unsuccessful attempts by two investigators from prosecutor's office and police officer to serve subpoena at witness' reported location); *State* v. *Schilling*, 474 N.W.2d 203, 205 (Minn. App. 1991) (unavailability properly found based upon failure of witness to honor subpoena for first trial date and on return of unserved subpoena for second trial date); *State* v. *Nielson*, 316 Or. 611, 618–19, 853 P.2d 256 (1993) (unavailability properly decided based upon police attempts to subpoena declarant at various locations and on persistent checks of police computer system to determine arrests, if any, on outstanding warrants); cf. *State* v. *Rivera*, supra, 220 Conn. 413 (where, inter alia, no attempt by defendant to seek police assistance in locating declarant, court determined declarant not unavailable).

A proponent's burden is to demonstrate a diligent and reasonable effort, not to do everything conceivable,

to secure the witness' presence. See *United States* v. *Potamitis*, 739 F.2d 784, 789 (2d Cir.), cert. denied, 469 U.S. 918, 105 S. Ct. 297, 83 L. Ed. 2d 232 (1984). On the basis of the record before us, we conclude that the defendant did not conduct merely a cursory threshold inquiry into Nestir's whereabouts. Rather, he exercised due diligence in making a good faith effort to secure Nestir's attendance and thereby sufficiently demonstrated Nestir's unavailability. The sheriffs failed to serve the capias and refused to return the defendant's telephone calls, and the court would not allow the police to explain what efforts they had made. Admittedly, Spina, a private investigator who had spoken with Nestir's mother in his attempts to locate Nestir but who had not been allowed by the court to testify in connection with those efforts, did not travel to New London on May 21. Sisson, however, who worked for the public defender's office with which the defendant had a conflict and who could not do extensive work for the defendant because of that conflict, had access to the public defender's computer that provided "the entire clerk system and everything [except the youthful offender docket] that happens in the court system." Unfortunately, Sisson could not get any confirmation from the computer or the public defender's office in New London that Nestir was due in court there that day. Therefore, there was little reason to send Spina to New London. Although Sisson failed to search the youthful offender docket, the state, having obtained a continuance of Nestir's case for its own purposes, knew whether she was being treated as a youthful offender. The state, however, was all but told by the court that it did not have to provide the defendant with such information.[20] Under the circumstances of this case,

---

[20] On May 21, the defendant asked the state on two separate occasions whether Nestir's case was on the youthful offender docket and to verify that she was, indeed, to be in court on that day. See footnotes 12 and 17 of this opinion.

Sisson's omission did not undermine the reasonable efforts of the defendant to locate Nestir.[21]

Our decision today does not alter what we have stated many times: it is within the discretion of the trial court to accept or to reject the proponent's representations regarding the unavailability of a declarant and the trial court's ruling will generally not be disturbed unless the court has abused its discretion. *State* v. *Rivera,* supra, 220 Conn. 412. In the present case, however, it appears that the trial court (1) improperly relied on the fact that Nestir had been available during the presentation of the state's case to decide that she consequently remained available; see *United States* v. *Eufracio-Torres,* 890 F.2d 266, 270 (10th Cir. 1989), cert. denied, 494 U.S. 1008, 110 S. Ct. 1306, 108 L. Ed. 2d 482 (1990) (prior deposition testimony did not preclude finding of unavailability where witness failed to honor promise to return); (2) improperly denied the defendant the opportunity to create a record regarding the efforts of the New Haven police department to locate Nestir; see *State* v. *Onofrio,* 179 Conn. 23, 34, 425 A.2d 560 (1979) (court has no discretion to deprive aggrieved party of proper record for appeal); and (3) improperly foreclosed the defendant's inquiry of the state regarding Nestir's court appearance in New London. Accordingly, we conclude that the defendant demonstrated a genuine, diligent, reasonable and good faith effort to secure Nestir's presence and that, therefore, the trial court abused its discretion in failing to determine that Nestir was unavailable.

---

[21] At one point, the defendant had suggested a search and seizure warrant, which the trial court indicated it would "consider." Although the defendant never provided the court with an application for a warrant, in the meantime, he did elicit the help of Sergeant Marci of the New Haven police department to serve the capias. The trial court, however, precluded the defendant from allowing Marci to testify about the unsuccessful efforts she had made on the defendant's behalf to locate and serve Nestir. Therefore, an application for a warrant, in all likelihood, would have been futile.

The case is remanded to the Appellate Court with direction to remand the case to the trial court for further proceedings.

In this opinion BERDON and NORCOTT, Js., concurred.

CALLAHAN, J., with whom PETERS, C. J., joins, dissenting. I dissent from the majority opinion because I cannot agree that the trial court abused its discretion when it determined that the defendant had failed to meet his burden of proving that Lenise Nestir, the declarant of an out-of-court statement, was unavailable to testify in this case and that the defendant had made all reasonable efforts to procure Nestir's appearance at trial. I also disagree with the majority that the trial court "did not decide whether [Nestir's] statement was trustworthy" and that we should remand this case to the trial court for that determination. I would conclude that the trial court did determine that even if Nestir were unavailable, her purported statement to Robin Shade was untrustworthy and therefore inadmissible and that the court did not abuse its discretion in excluding Nestir's statement. I therefore respectfully dissent.

I

In any analysis of the admissibility of a declaration against penal interest, the trial court must first determine whether the declarant is unavailable. Only if unavailability has been shown by the proponent of the proffered hearsay statement will the court proceed to an examination of trustworthiness. *State* v. *DeFreitas*, 179 Conn. 431, 443, 426 A.2d 799 (1980) ("[w]e have been unable to find a case . . . where an appellate court has dispensed with the unavailability of the declarant as a condition precedent to admitting such declarations"); see also *State* v. *Frye*, 182 Conn. 476, 480–81, 438 A.2d 735 (1980). In *State* v. *Frye*, supra,

481, we recognized five of the most common situations in which the declarant will be deemed unavailable. The only one of those situations relevant here is where the declarant is "absent from the hearing and the proponent of [her] statement has been unable to procure [her] attendance . . . by process or other reasonable means." (Internal quotation marks omitted.) Id. "In interpreting 'reasonable means,' we have held that the proponent must exercise due diligence and, at a minimum, make a good faith effort to procure the declarant's attendance. *State* v. *Aillon*, 202 Conn. 385, 391, 392, 521 A.2d 555 (1987), citing *State* v. *Weinrib*, 140 Conn. 247, 252, 99 A.2d 145 (1953), and *State* v. *DeFreitas*, supra, 445. The trial court has broad discretion in determining whether the proponent has shown a declarant to be unavailable. 'Only upon a showing of a clear abuse of discretion will this court set aside on appeal rulings on evidentiary matters.' *Dunham* v. *Dunham*, 204 Conn. 303, 324, 528 A.2d 1123 (1987)." *State* v. *Rivera*, 220 Conn. 408, 411–12, 599 A.2d 1060 (1990).

I disagree with the majority that the trial court clearly abused its discretion when it concluded that the defendant had failed to meet his burden of demonstrating that the declarant could not be located and her presence could not be procured by reasonable efforts on his part. By repeating several times the halfhearted attempts that the defendant had made to locate Nestir, the majority creates the illusion that the defendant undertook substantial efforts to locate the seventeen year old witness who seemingly, according to the defendant, had disappeared from New Haven into thin air. Repetition, however, does not add significance to the defendant's endeavors to locate Nestir.

The defendant's efforts can be stated simply and concisely. First, on Friday, May 14, 1993, the defendant prepared a subpoena for Nestir to appear in court as a defense witness on Monday, May 17. The subpoena

was served as Nestir was leaving court after having testified pursuant to the state's subpoena during the state's case-in-chief.[1] Nestir did not honor the defendant's subpoena. At the defendant's request, therefore, the trial court issued a capias for Nestir. On May 19, Deputy Sheriff Harold Pepper went to Nestir's home at 445 Poplar Street in New Haven to serve the capias but was unable to locate Nestir at that time. Pepper then returned the capias to the sheriff's office in the courthouse. At 4:45 p.m. on May 19, defense counsel retrieved the capias from the sheriff's office and, after having been informed that the sheriff's office normally would not attempt service after 5 p.m., placed several telephone calls to Pepper, who did not return the calls. Also on May 19, the private investigator who worked with defense counsel on various aspects of the defendant's case, telephoned Nestir's mother and asked her to have Nestir report to court the next morning despite the mother's representation that she did not know Nestir's whereabouts. On May 20, defense counsel asked Frank Kinney, the high sheriff, to procure another sher-

---

[1] When asked later why he had not simply cross-examined Nestir about the purported statement to Shade when he had the opportunity to do so, the defendant argued in the alternative that either: (1) he had not known of the statement at that time and had merely prepared the subpoena for the next court day in the event that someone would fortuitously come forward over the weekend with new evidence pertaining to Nestir; or (2) he had considered the topic of Nestir's alleged statement to Shade to be beyond the scope of the state's direct examination and did not feel that the court would allow him to cross-examine on that subject. The defendant concedes that the only one of the eighteen witnesses who testified for the state and was subject to cross-examination by him, and who the defendant subsequently subpoenaed, was Nestir. At no point during the proceedings before either this court or the trial court has the defendant offered any reason why he had prepared the subpoena for Nestir without having known that there was additional ground to be covered with her. If it is the case that the defendant did know of the statement purportedly made to Shade at the time that he cross-examined Nestir during the state's case-in-chief, then his tactical decision to pursue that line of inquiry at a later time precludes a finding of unavailability. See *State* v. *DeFreitas*, supra, 179 Conn. 445–47.

iff to serve the capias. Kinney told defense counsel that counsel was free to contact another deputy sheriff and provided him with a Rolodex containing the names of deputy sheriffs who could serve the capias. Defense counsel, however, inexplicably chose not to contact any of those sheriffs.

On May 21, Nestir had a scheduled court date in the New London courthouse. The defendant had been aware of Nestir's May 21 court appearance since May 13, when the state's attorney's office had informed him that it was going to have a scheduled May 14 New London court appearance for Nestir switched to May 21, in order to accommodate the court's schedule in the defendant's trial. The defendant made no efforts to verify the time and exact courtroom location of Nestir's New London appearance until May 21. The defendant moreover made no effort to have anyone present at the New London courthouse to serve the capias on Nestir. Instead, the defendant asked Robert Sisson, an investigator from the public defender's office, to find out, on the morning of her scheduled appearance, if Nestir would be in the New London courthouse that day. Sisson ran a search on a statewide computer system that lists pending cases and was unable to find any pending cases against Nestir. That system, however, does not include cases on the youthful offender docket and Nestir was only seventeen years old at the time of the defendant's trial. Sisson also called the New London public defender's office but was informed by the receptionist that she did not know Nestir. Sisson did not call the New London clerk's office or any other court functionary.

Lastly, on Friday, May 21, the defendant requested that "a search and seizure warrant issue so that [the authorities] may enter [Nestir's home] in the event she is there and take her into custody." The defendant did not present the court with a warrant application at that

time. The court replied: "With regard to the search warrant, if one is presented to the court, I will certainly consider it if it is in proper form. That probably should have been done this morning." Despite the court's willingness to consider a warrant application, the defendant never presented one to the court.[2]

I am not persuaded that the trial court's conclusion that the defendant's efforts fall below the standard of due diligence represents a clear abuse of discretion by the trial court. The defendant's failure to attempt to engage another sheriff to serve the capias after Pepper had failed to do so did not constitute due diligence. The defendant's failure to call the clerk's office or to send his investigator or anyone else to New London on the day of Nestir's scheduled appearance could also be found not to constitute due diligence.[3] Finally, the

---

[2] I take issue with the majority's use of the trial court's denial of the defendant's Friday, May 21 request for a continuance in order to make efforts to locate Nestir over the weekend. Although the trial court did deny the request for a continuance, the court also indicated to the defendant that if he were able to locate Nestir over the weekend, the court would consider allowing the defendant to reopen his case on Monday. " 'The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion.' *State* v. *Aillon*, [supra, 202 Conn. 394]." *State* v. *Hamilton*, 228 Conn. 234, 239, 636 A.2d 760 (1994). The court denied the request for a continuance only to prevent further delay in the case, without any harm to the defendant who was, in fact, given the weekend to find Nestir. There is no indication in the record that the defendant made any efforts to locate Nestir that weekend. I would not conclude that the trial court abused its broad discretion in "denying" the requested continuance until Monday when the trial court expressly indicated that it would consider allowing the defendant to present Nestir on Monday if she were present at trial.

[3] I am puzzled at the majority's assertion that "there was little reason to send [Louis] Spina to New London." I would think that the possible presence at the courthouse of the person who had allegedly confessed to the crime with which the defendant had been charged would have provided the defendant with ample reason to send his private investigator or someone else to New London to attempt to serve the capias, if the defendant actually wished to locate her. The defendant failed to pursue the most obvious avenue of confirming Nestir's presence at the courthouse, namely, whether the seventeen year old Nestir was on the youthful offender docket for the day

defendant's failure to prepare a search and seizure warrant for Nestir and her home despite the trial court's express willingness to sign such a warrant supports a finding of a lack of due diligence. I would therefore uphold the trial court's discretionary ruling that the defendant had not established that Nestir was unavailable.

## II

I also disagree with the majority's assertion that "the trial court . . . did not expressly make a finding on the trustworthiness of the statement." After concluding that Nestir was available, the trial court found, in the alternative, that the statement was untrustworthy. The court stated: "[T]he testimony by Miss Shade was unequivocal that the declarant was decidedly untrustworthy in her eyes. And so there's a matter of trustworthiness even if you get past the fact that she seems to be available. . . . [Shade] said [she] wouldn't accept anything that [Nestir] said without proof. . . . The conclusion I reach is that she (a) is available and that (b) if she were unavailable the trustworthiness is seriously, seriously in doubt." I am not persuaded, in light of the record, that the trial court abused its broad discretion in its ruling on that issue.

The trial court based its conclusion of untrustworthiness on Shade's own testimony that Nestir often lied to her and that she did not trust Nestir.[4] The trial court's

---

that she was supposed to be at court. The defendant's attempts at other, inapplicable, avenues cannot seriously be considered due diligence.

[1] Shade testified as follows:

"[Assistant State's Attorney]: And you wouldn't believe her because a lot of times she would lie to you, isn't that true?

"[Shade]: Yes.

"Q. And so that you really couldn't—if she were to tell you something you really couldn't rely on it, could you?

"A. Not unless she proves things. I tell her to prove things now.

"Q. Because you didn't trust her?

"A. No, I didn't trust her."

conclusion is further supported by its observance of Nestir's demeanor, particularly her vacillation during her testimony in the state's case-in-chief. Having read that testimony, I am not surprised that the trial court concluded that Nestir was untrustworthy. Nestir's testimony revealed her to have, at best, only a passing acquaintance with the truth.[5]

In addition to other factors such as observation to assess a declarant's general trustworthiness or lack thereof, "[f]our considerations have been deemed relevant when examining the trustworthiness of declarations against penal interest: (1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; [and] (4) the availability of the declarant as a witness."[6] (Internal quotation marks omitted.) *State* v. *Rosado*, 218 Conn. 239, 244–45, 588 A.2d 1066 (1991).

A

The timing of Nestir's purported statement, which supposedly occurred one and one-half days after the shooting, supports its untrustworthiness.[7] Nevertheless, upon consideration of *all* the evidence before the trial court, I am not persuaded that Shade was a person in whom Nestir would naturally confide, a conclusion that weighs heavily against the admissibility of the state-

[5] For instance, Nestir testified at trial that she had seen the defendant driving a brown car shortly after the shooting, contrary to her testimony at the probable cause hearing that Alex Romero had been the driver. When confronted with this inconsistency, Nestir claimed to have forgotten who had been driving the brown car minutes after the shooting.

[6] Although it is well established in our precedents, I must confess that I am uncertain how, if at all, the availability of the declarant affects the independent inquiry pertaining to trustworthiness.

[7] It should be noted that, according to the defendant, Shade inexplicably did not come forward with Nestir's purported statement admitting to a murder until the defendant's trial was underway two years later.

ment. "[T]he witness testifying as to the statement must be one in whom the declarant would naturally confide." *State* v. *Hernandez*, 204 Conn. 377, 392, 528 A.2d 794 (1987). "There must be a relationship in which the two parties to the conversation had a close and confidential relationship." *State* v. *Rivera*, 221 Conn. 58, 70, 602 A.2d 571 (1992).

The burden of establishing the requisite relationship rests on the proponent of the statement. See id., 70–71. I fail to see a "close and confidential relationship" between Shade and Nestir. To the contrary, the evidence supports the opposite conclusion. Shade testified that Nestir had a habit of shoplifting and had embroiled Shade's children in trouble with the law. Shade also testified that she had blamed Nestir for one of her daughter's arrests for several petty offenses, and that she believed that Nestir was a bad influence on her children. Shade further testified that she knew Nestir well, that she did not trust Nestir and that Nestir had often lied to her.

Although Shade had once taken care of Nestir for a period of eleven months and, shortly thereafter, again for a period of nine months, her care for Nestir had occurred when Nestir was only eight or nine years old, *eight years prior to when Nestir made the alleged statement to Shade.* In addition, although Shade testified that Nestir *used to* tell other people that Shade was her "aunt,"[8] in the absence of any known time frame when that occurred and in the context of the other evidence adduced regarding the relationship between Shade and Nestir, testimony that Nestir at some time may have called Shade "aunt" is of little significance. To determine whether a person is one in whom a third party

---

[8] It appears from Shade's testimony that Nestir referred to Shade as her "aunt" when Shade had cared for her eight years prior to when Nestir made the alleged statement to Shade.

declarant would naturally confide, we consider relationships as they actually exist rather than the labels attached to the relationship, and have concluded that even blood relatives may not possess such a confidential relationship. See id. (sibling relationship did not establish close and confidential relationship where brothers did not grow up together or get along well, and where one brother had burglarized other brother's apartment). Shade testified that she had stopped taking care of Nestir *eight years before the shooting* because Nestir "like[d] to go on the streets constantly." Although Nestir occasionally visited Shade's residence,[9] Shade herself testified that those visits were limited to about one hour in length and confined to certain areas of the house. Moreover, Shade did not always allow Nestir into her residence when Nestir visited. It is reasonable to infer from this evidence that, although Nestir and Shade knew one another and were more than mere acquaintances, a certain hostility existed between them and that Shade was not a close friend of Nestir or a person in whom Nestir would naturally confide. See id.; *State* v. *Mayette*, 204 Conn. 571, 578–79, 529 A.2d 673 (1987); *State* v. *Sanchez*, 200 Conn. 721, 726, 513 A.2d 653 (1986).

## B

I also would not conclude that Nestir's alleged statement was sufficiently corroborated. "The corroboration requirement for the admission of a third party statement against penal interest *is significant and goes beyond minimal corroboration.* Third party statements exculpating an accused are suspect and the requirement of corroboration, to effectuate its purpose of circumventing fabrication, must be construed as requiring *cor-*

---

[9] The record fails to disclose the purpose of Nestir's visits to Shade's residence. The record also fails to disclose whether Nestir visited Shade's residence to visit Shade or to visit Shade's daughters, with whom she was friendly.

*roborating circumstances that clearly indicate the trustworthiness of the proffered statement."* (Emphasis added.) *State* v. *Rosado,* supra, 218 Conn. 249. Shade testified that Nestir had told her that: (1) a fight between her and the victim's brother had instigated the shooting; (2) she had enlisted the help of a group of young men to beat the victim's brother; (3) immediately prior to the shooting, she and a group of young men had driven around in an automobile to search for the victim's brother; and (4) when she and the group of men found the victim and his brother, she had seized a gun from another occupant of the automobile and had fired the gun at the victim's brother, hitting the victim instead.[10] None of these crucial components of Nestir's alleged statement was corroborated.

The proper focus of a reviewing court's analysis is the existence of corroborating evidence to substantiate the truth of the facts contained in the statement. *State* v. *Mayette,* supra, 204 Conn. 579; *State* v. *Hernandez,* supra, 204 Conn. 392. Few circumstances in this case are relevant to the issue of corroboration, and the amount of corroboration provided thereby is minimal.

---

[10] During direct examination at the voir dire pertaining to the admissibility of Nestir's alleged statement, Shade testified: "[Nestir] told me that her and [the victim's brother] had a fight. . . . [She] and [the victim's brother] had a fight. [The victim's brother] was supposed to smack her in the face and she said that no F-body is going to smack her in the face and she is going to get some boys from Liberty Street to beat his butt. As far as I know she got a car full of guys and she said that one of them had the gun shooting it out the window up to the sky and she grabbed it from the guy and pointed it to [the victim's brother] and it didn't hit [the victim's brother] it hit someone else and she said it was [the victim]."

On cross-examination, Shade testified: "[Nestir] said that her and [the victim's brother were] having a fight and [the victim's brother] was supposed to slap her and she didn't like that. She said she was going to get some boys from Liberty Street to go kick his butt and she got guys in the car, that were riding around [D]avenport [Avenue] and she said—she said they were playing basketball and one of the guys was firing up to the sky and she grabbed the gun from the guy and she start[ed] firing and she meant to point—shoot it at [the victim's brother] but she got someone else. She said [the victim]."

The only evidence corroborative of any aspect of Nestir's statement is: (1) the undisputed fact that Nestir possessed the murder weapon eight days after the shooting;[11] and (2) the testimony by one witness—contradicted by the unequivocal testimony of the four other witnesses to the shooting who testified that they had seen the shooter—that Nestir was present in the automobile from which *another person* had fired the fatal shots. This evidence is minimal and speculative and fails to ensure trustworthiness. See, e.g., *State* v. *Rosado*, supra, 218 Conn. 246–49 (few corroborating factors to indicate trustworthiness of statement); *State* v. *Mayette*, supra, 204 Conn. 579–80 (same). Unlike the two cases in which we have concluded that the trial court had abused its discretion in failing to admit a third party declaration against penal interest into evidence and in which "a myriad of corroborating circumstances" actually existed and evinced the trustworthiness of the third party statement; *State* v. *Bryant*, 202 Conn. 676, 701, 523 A.2d 451 (1987) (robbery victim's stolen pocketbook and driver's license seen by several witnesses in third party's possession after robbery, third party fit general description of assailant and knew location of victim's apartment, similar inculpatory statements repeated to several persons, and inculpatory statements contained particular and verified details of crime); *State* v. *Gold*, 180 Conn. 619, 634, 635–36, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980) (witnesses saw bloody shirt in third party's possession on night of murders, third party identified running from scene of crime by disinterested witness, evidence that third party left state after murders, third party's confession overheard by other person, and similar inculpatory statements repeated to several persons); the record in the present case reveals few cor-

---

[11] Nestir's uncontradicted testimony was that she had been given the gun after the shooting and had kept the gun for several days hoping to exchange it for an automobile.

roborating circumstances indicative of the trustworthiness of Nestir's alleged statement.

The evidence of "noncorroboration" is far more compelling in this case. Of the five eyewitnesses to the shooting who testified at trial, none identified a female as the shooter.[12] Moreover, of the three eyewitnesses who identified a particular shooter, all unequivocally identified someone other than Nestir as the shooter.[13] Jeanette Ayala testified that a man named Moses had fired the fatal shots.[14] Ivanez Virvet testified that the defendant had fired the fatal shots.[15] Last, Alex Romero testified that the fatal shots had come from the car

---

[12] Paul Crnkovic and Ivanez Virvet, two witnesses for the state who saw the shooter, identified the defendant as the shooter. A third witness for the state, Perry Moore, identified the shooter as an unknown Latino male. A fourth eyewitness for the state, Angelo Virvet, corroborated the details provided by the other three witnesses for the state, but did not see who was in the automobile from which the shots had been fired. Alex Romero, a witness for the defense, testified that David Morales had fired the shots that had killed the victim. Jeanette Ayala, who testified for the defense, said that a man named Moses had fired the shots that had killed the victim.

[13] The defendant himself, in a statement made to the police, admitted that he had been present at the shooting and said that Alex Romero had been the shooter. The defendant recanted that statement at trial.

[14] Ayala testified as follows:

"[Assistant State's Attorney]: Who was sitting in the front of the gray car? . . .

"[Ayala]: Moses.

"Q. All right. Moses. Who else was in the front of the car?

"A. The driver.

"Q. Anybody else in the front of the car?

"A. No.

"Q. Tell us who was in the back?

"A. George, Lenise and Bubba.

"Q. Now, Miss Ayala, tell us who you claim you saw in that gray car firing the gun?

"A. Moses.

"Q. Moses. So it is Moses that killed [the victim] to your knowledge?

"A. Yes."

[15] Virvet testified as follows:

"[Virvet]: Shots came out of the brown car.

"[Assistant State's Attorney]: Could you see who was firing those shots?

he had been driving and that the shooter had been David Morales.[16]

There is also no corroboration for other key elements of Nestir's alleged statement: that the motive for the shooting was Nestir's earlier fight with the victim's brother[17] and that Nestir had solicited help from several young men to "get even" with the victim's brother. Moreover, there is no independent evidence that corroborates that Nestir had made the statement to Shade, or even that she had spoken to Shade at any time subsequent to the shooting. See *State* v. *Sanchez*, supra, 200 Conn. 726. There is likewise no evidence that Nestir, at any time prior to or subsequent to her supposed statement to Shade, repeated her statement either in whole or in part. See *State* v. *Rivera*, supra, 221 Conn. 70 (lack of reiteration of confession vitiates trustworthiness); *State* v. *Mayette*, supra, 204 Conn. 578 (same).

---

"A. Yes.

"Q. Tell the jury who was firing those shots.

"A. [The defendant].

\* \* \*

"Q. [D]o you have any idea as to who actually shot and killed [the victim]?

"A. I know that the shots that were coming from the brown car was the one that got [the victim]."

The fact that Virvet also testified that shots emanated from a gray car is irrelevant to the issue of whether Nestir's alleged statement was corroborated, as the alleged statement did not contain any reference whatsoever to a gray car. See footnote 5. The majority's use of this evidence as a corroborative circumstance, therefore, is puzzling.

[16] Romero testified as follows:

"[Assistant State's Attorney]: What happened as you proceeded westbound on Davenport Avenue?

"[Romero]: As soon as I got to the light—there's a light on Winthrop Avenue and Davenport. I was there.

"Q. Were you stopped?

"A. Yeah, I stopped. I was waiting for the red light to turn green and as soon as the light [turned] green I started taking off and David Morales just pulled out the gun and just started shooting outside my window."

[17] To the contrary, evidence adduced at trial established that the shooting had been motivated not by an alleged quarrel between Nestir and the victim's brother, but by a feud between the victim's brother and members of a rival street gang.

In light of the weak nature of the corroborative evidence to support the trustworthiness of Nestir's alleged statement, I cannot say that the trial court abused its broad discretion in concluding that Nestir's alleged statement was not sufficiently trustworthy to be admissible at trial.

To reiterate, our primary function in this appeal is to determine whether the trial court abused its discretion in refusing to admit Shade's testimony. The Appellate Court, in a unanimous decision, concluded that the trial court had not abused its discretion. *State* v. *Lopez*, 38 Conn. App. 434, 439, 662 A.2d 792 (1995). As did the Appellate Court, I would defer to the trial court on that issue. The trial court heard the testimony and, therefore, was able to assess credibility before exercising its discretion to exclude Shade's testimony. The trial court's ruling should be sustained.

I respectfully dissent.