### STATE OF CONNECTICUT *v.* SCOTT LEWIS
### (SC 15323)

Callahan, C. J., and Borden, Berdon, Norcott and Katz, Js.

Argued January 14—officially released August 4, 1998

*Lauren Weisfeld*, assistant public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David P. Gold*, assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Scott Lewis, appeals[1] from the judgment of conviction, after a jury trial, of

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

two counts of murder in violation of General Statutes §§ 53a-8 and 53a-54a,[2] and two counts of felony murder in violation of General Statutes § 53a-54c.[3] The defendant claims that: (1) the evidence was insufficient to prove felony murder beyond a reasonable doubt; (2) the court improperly limited cross-examination of the state's key witness; and (3) the court improperly excluded evidence of a third party confession. The defendant also raises several challenges to the trial court's jury instructions. Specifically, the defendant claims that the court improperly: (1) failed to charge the jury on self-defense; (2) refused to give the jury a missing witness instruction under *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960); and (3) instructed the jury regarding reasonable doubt. The defendant also claims that his protection against

---

[2] General Statutes § 53a-8 provides in relevant part: "Criminal liability for acts of another. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[3] General Statutes § 53a-54c provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

double jeopardy was violated because he was convicted and sentenced for both murder and felony murder as to each victim. We agree with the defendant's double jeopardy claim and, accordingly, we reverse the judgment in part. In all other respects, however, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1990, the defendant, Stefon Morant and Jeff Rochler were partners engaged in the sale of drugs from a house on Clay Street in New Haven. Ovil Ruiz, the state's key witness, was involved in various aspects of the drug operation and had known the defendant for approximately seven years. As part of this drug operation, one of the victims, Ricardo Turner, stored drugs and drug money in his second floor apartment at 634 Howard Avenue, New Haven. The other victim, Edward Lamont Fields, was Turner's roommate.

Prior to and during the evening of October 10, 1990, Ruiz and Jose Roque, who was also involved in the drug operation, overheard a discussion between the defendant and Morant in which they discussed the possibility that Turner might abscond with the money and drugs in his apartment and leave the area. On the night of October 10, the defendant, Morant and Ruiz drove by the victims' apartment building in a rental car to conduct surveillance. Upon arriving back at the Clay Street house, the defendant told Ruiz to get certain guns that were hidden in the house. Ruiz retrieved a .38 caliber handgun and a .357 caliber handgun, and gave both weapons to the defendant.

The defendant then put both weapons in his own vehicle, and he, Morant and Ruiz drove to Howard Avenue. They arrived at the victims' apartment building at approximately 4 a.m., and the defendant parked his car a short distance away at the corner. Upon arrival, the defendant turned to Morant and Ruiz and said, "look,

whatever happens, we keep it between us." The defendant then told Ruiz to keep the car running while the defendant and Morant went upstairs to get the money and drugs. The defendant was armed with both guns as he and Morant walked toward the victims' apartment building.

The building contained five apartments on three floors: two apartments on each of the first and second floors, and a single apartment on the third floor. The victims' apartment was one of the two on the second floor, located at the rear of the building. The building was secured by a locked front security door and a locked back door. Entry into the building required using an intercom system and being "buzzed in" through the front security door by one of the tenants.

The jury also reasonably could have found that the defendant and Morant entered the building. They then proceeded to the second floor where they entered the victims' apartment and the defendant shot both victims to death with the .357 caliber handgun. They then ran through the hall, down the stairs and out the front door.

Meanwhile, shortly after hearing several gunshots, Ruiz, who had switched to the driver's seat of the defendant's car, saw the defendant and Morant running. He made a U-turn, picked them up in front of Turner's building, and immediately drove away. The defendant was carrying a brown bag labeled "Community Bank," which was "bulging" with cash, and Morant carried a blue gym bag labeled "Puma," which was full of drugs. At that time, the defendant was armed with the .357 caliber handgun, and Morant was armed with the .38 caliber handgun.

As Ruiz drove away, the defendant and Morant insisted that Morant drive because Ruiz was driving erratically. Ruiz switched to the back seat, where he confirmed the contents of the bags. After a short while,

the defendant asked Morant whether he thought they were dead, and Morant answered, "don't worry about it, forget about it, they got what they deserved." The three men then returned to Clay Street, and later that morning turned over all of the money to Rochler.

On the same morning of October 11, 1990, Diane Basilicato, who lived in the second floor front apartment of the victims' apartment building on Howard Avenue, returned home and entered her apartment shortly after 4 a.m. She did not hear the buzzer system operate or anyone enter the building after she had entered. Within a few minutes of entering her apartment, Basilicato heard five or six loud "bangs," and heard two people running down the stairs and out of the building.

Shortly thereafter, the tenant in the first floor rear apartment called the police to report hearing a disturbance and a "loud thump" from the second floor apartment, followed by the appearance of a bullet hole in the ceiling of her apartment. The police were dispatched to the building at 4:34 a.m., and arrived approximately two minutes later. The police found both the front security door and the back door locked.

Basilicato admitted the police into the building through the use of the intercom system. Upon arrival, the police entered the second floor rear apartment and found the bodies of the victims. Turner, clad only in underwear, was lying face down on the bed. He had been shot four times, including one shot to the top of the head that split his brain into three pieces, one to his back, and one to his side.[4] Fields, also clad only in underwear, was lying on the floor next to the bed. He had been shot twice in the back from a distance of no more than eighteen inches and had bled to death from

---

[4] The testimony of the medical examiner is somewhat unclear regarding the location of the fourth bullet wound.

his wounds. The ballistics investigation disclosed that all the bullets had been fired from a .357 caliber handgun. There was no gun found near the bodies of the victims.

Several weeks after the shootings, both Ruiz and Roque saw the defendant discard the .357 caliber handgun into the Mill River under the Chapel Street Bridge in New Haven, when all three were present in the park at Chapel Street. After questioning Ruiz in January, 1991, the police searched the river near the Chapel Street park for the .357 caliber handgun that the defendant had thrown in the river, but were unable to recover it.

At the trial, the defendant raised an alibi defense, claiming that he had worked the entire night at the Minuteman Press on Grand Avenue in New Haven, which was partly owned by Rochler. The jury found the defendant guilty of both murder and felony murder for the death of Turner and Fields. The trial court rendered judgment in accordance with the jury's verdict. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the evidence was insufficient to support his convictions of felony murder because neither of the underlying crimes of robbery or burglary was proven. Specifically, the defendant claims that the state could not prove that he committed larceny, an element of robbery and burglary, because the defendant was the owner of the money and drugs taken from the victims' apartment. He also contends that there was no evidence of an unlawful entry to establish the crime of burglary, and that without proof of all of the elements of the underlying crimes he could not be convicted of felony murder. The state contends that there was sufficient evidence of the underlying crimes. We

conclude that there was sufficient evidence to prove the commission of the underlying crime of robbery. We need not, therefore, consider whether there was sufficient evidence of a burglary.

"In reviewing a sufficiency of the evidence claim, the dispositive question is whether, viewing the evidence in the light most favorable to sustaining the verdict, the trier of fact reasonably could have concluded, from the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. . . . Although the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Raguseo*, 225 Conn. 114, 119, 622 A.2d 519 (1993); *State* v. *Stanley*, 223 Conn. 674, 677–78, 613 A.2d 788 (1992).

The defendant was charged with felony murder in violation of § 53a-54c. "In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, that a death was caused in the course of and in furtherance of that felony." *State* v. *Castro*, 196 Conn. 421, 428–29, 493 A.2d 223 (1985); see *State* v. *Diaz*, 237 Conn. 518, 531, 679 A.2d 902 (1996); *State* v. *Deleon*, 230 Conn. 351, 362, 645 A.2d 518 (1994); see also footnote 3 of this opinion. Although the information charged both robbery and burglary as

the crimes underlying the felony murder charge, in order to convict the defendant the state was required to prove only one of the two underlying crimes. See General Statutes § 53a-54c (felony murder charge lies from death occurring in course of burglary *or* robbery). With regard to the felony murder counts, the trial court properly instructed the jury that either robbery or burglary could be the underlying crime for felony murder. The defendant does not challenge this instruction.

In order to prove the commission of a robbery, the state must prove that the defendant committed larceny and that the larceny was committed with a threat of or the immediate use of physical force. See General Statutes § 53a-133.[5] "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself . . . he wrongfully takes, obtains or withholds such property from an *owner*." (Emphasis added.) General Statutes § 53a-119. Our Penal Code defines "owner" for purposes of larceny as "any person who has a right to possession superior to that of a taker, obtainer or withholder." General Statutes § 53a-118 (a) (5). " 'Property' means any money, personal property . . . or article of value of any kind." General Statutes § 53a-118 (a) (1).

As the defendant conceded at oral argument before this court, his contention that he could not be considered to have stolen "his" drugs and drug money is controlled by our recent decision in State v. Morant, 242 Conn. 666, 671–72, 701 A.2d 1 (1997). In that case, we concluded that the definition of "property" in § 53a-118 (a) (1) "preclude[s] the defendant's ownership of

---

[5] General Statutes § 53a-133 provides: "Robbery defined. A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

cocaine and the money made from its sale." Id., 672. Similarly, in the present case, the defendant did not have a property interest in the contraband, and committed larceny when he retrieved the drugs and the drug money. We concluded in *Morant* that "a person commits a robbery when he forcibly takes contraband from another person's possession." Id. In the present case, the jury reasonably could have found that the defendant and Morant entered the victims' apartment with the intent to gain possession of the drugs and the drug money. The jury also reasonably could have found that they then forcibly took the drugs, the drug money and two bags from Turner's possession. Although the defendant claims that the drugs and the drug money belonged to him, he had no legal right to recover such "property" from Turner's possession by force. Viewing the evidence in a light most favorable to sustaining the verdict, we conclude that there was sufficient evidence for the jury to determine that a robbery had occurred and that, therefore, there was sufficient evidence to support the defendant's conviction for felony murder.

II

The defendant also claims that the trial court improperly limited his right of cross-examination of Ruiz in violation of his right to confrontation as guaranteed by the federal and state constitutions.[6] Specifically, the

---

[6] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence."

Article first, § 8, of the constitution of Connecticut, as amended by article twenty-nine of the amendments, provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; [and] to have compulsory process to obtain witnesses in his behalf . . . ."

Because the defendant has failed to provide an independent and adequate state constitutional analysis, we will address only his claim alleging a viola-

defendant argues that the trial court improperly limited his examination of Ruiz' extensive documented history of mental illness, which the defendant claims would have further impeached Ruiz' credibility. We disagree.

"It is axiomatic that the defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. . . . The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination." (Internal quotation marks omitted.) *State* v. *Joyce*, 243 Conn. 282, 307, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998); *State* v. *Barnes*, 232 Conn. 740, 745–46, 657 A.2d 611 (1995). "It is [also] well settled that a defendant's constitutional right to confront and cross-examine witnesses against him includes the opportunity to explore the witness' mental capacity to observe, recollect and narrate an occurrence." *State* v. *Morant,* supra, 242 Conn. 674–75. "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Joyce,* supra, 307. With these principles in mind, we turn to the defendant's claim.

Ruiz' testimony regarding his mental health, during both direct examination and cross-examination, was extensive. On direct examination, Ruiz testified about the danger he faced in prison for having given a statement to the police implicating the defendant and Mor-

tion of his federal constitutional rights. *State* v. *Genotti,* 220 Conn. 796, 811–12, 601 A.2d 1013 (1992); *State* v. *Perez,* 218 Conn. 714, 723, 591 A.2d 119 (1991).

ant. Ruiz testified that he was in danger in the general prison population because it was widely known among other prison inmates that he had cooperated with the police and the state's attorney in the defendant's prosecution. To corroborate this testimony, the state introduced two letters that contained threats on Ruiz' life. Ruiz also testified about the steps that he had taken in an effort to protect himself from the threats and assaults that he had endured for being a "snitch." Ruiz testified that, in order to gain a transfer out of the general prison population into protective custody, he had tried to hurt himself on several occasions, he had attacked other inmates, and he had told mental health workers that "there was stuff growing out of [his] arms . . . and [that he] used to speak to the devil."

On cross-examination, Ruiz testified about his mental health, the fires that he had started while in prison, that he had been diagnosed with paranoid schizophrenia by the state psychiatrists and psychologists, and the anti-psychotic medications that had been prescribed for him. The cross-examination into Ruiz' mental health was extensive, and lasted the entire morning of the second day of trial and continued into the third day of trial. The defendant also introduced into evidence an order by a physician for the treatment of Ruiz in a mental hospital, a document signed by Ruiz in which he claimed to have a hereditary mental problem, and an inmate medical screening form that noted that Ruiz suffered a "psychiatric condition, a seizure disorder and schizophrenia." In addition, the defendant introduced into evidence a psychiatric assessment of Ruiz.

The defendant, nevertheless, claims that the trial court improperly excluded certain other documents that he had offered. These documents included: (1) a court docket sheet purporting to show that Ruiz had been found incompetent to stand trial in February, 1991, and had been found to have regained his competency

in April, 1991, after undergoing a period of treatment; (2) notes of a clinical psychologist offered as a hospital record; (3) a correctional department disciplinary report; and (4) a document that recorded that Ruiz suffered from "flashbacks of a shooting of two men in New Haven by the Latin Kings."[7] The defendant contends that this evidence was necessary to impeach Ruiz' testimony at trial that he had feigned mental illness in order to obtain a transfer out of the general prison population into protective custody. We are not persuaded by these claims.

"Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection [to the trial court]. . . . This court reviews rulings solely on the ground on which the party's objection is based." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau,* 235 Conn. 274, 310, 664 A.2d 743 (1995). The court docket sheet in question bears the name "Augustine Donald a/k/a Ovil Ruiz," and the trial court stated that it would consider admitting the document if the defendant could prove that Augustine Donald was the same individual as Ovil Ruiz.[8] The defendant, however, never made such an offer of proof. Furthermore, the defense offered the clinical psychologist's notes as a hospital record. The trial court sustained the state's objection, however, on the ground that the notes were neither hospital records

[7] The defendant also claims that the trial court improperly excluded from evidence an application and writ for habeas corpus referring to Hiram Castro and Augustine Castro; a correctional department disciplinary report; a health service progress note; and an initial medical assessment. The defendant, however, never offered the habeas corpus application, disciplinary report, and progress note as full exhibits. Moreover, the defendant never objected to the admission as a full exhibit of only a portion of the initial medical assessment.

[8] Ruiz had testified that he also used the names Augustine Castro and George Melendez.

nor certified pursuant to General Statutes § 4-104.[9] The defendant does not challenge the merits of that ruling on appeal. Moreover, the other two documents were offered by the defendant as containing a prior inconsistent statement of Ruiz. Because Ruiz did not deny the contents of either of the documents, however, and because the trial court found that there was no inconsistency, the court sustained the state's objections to their admission. The defendant does not challenge the merits

---

[9] General Statutes § 4-104 provides: "Inspection and subpoena of hospital records. Each private hospital, public hospital society or corporation receiving state aid shall, upon the demand of any patient who has been treated in such hospital and after his discharge therefrom, permit such patient or his physician or authorized attorney to examine the hospital record, including the history, bedside notes, charts, pictures and plates kept in connection with the treatment of such patient, and permit copies of such history, bedside notes and charts to be made by such patient, his physician or authorized attorney. If any such hospital, society or corporation is served with a subpoena issued by competent authority directing the production of such hospital record in connection with any proceedings in any court, the hospital, society or corporation upon which such subpoena is served may, except where such record pertains to a mentally ill patient, deliver such record or at its option a copy thereof to the clerk of such court. Such clerk shall give a receipt for the same, shall be responsible for the safekeeping thereof, shall not permit the same to be removed from the premises of the court and shall notify the hospital to call for the same when it is no longer needed for use in court. Any such record or copy so delivered to such clerk shall be sealed in an envelope which shall indicate the name of the patient, the name of the attorney subpoenaing the same and the title of the case referred to in the subpoena. No such record or copy shall be open to inspection by any person except upon the order of a judge of the court concerned, and any such record or copy shall at all times be subject to the order of such judge. Any and all parts of any such record or copy, if not otherwise inadmissible, shall be admitted in evidence without any preliminary testimony, if there is attached thereto the certification in affidavit form of the person in charge of the record room of the hospital or his authorized assistant indicating that such record or copy is the original record or a copy thereof, made in the regular course of the business of the hospital, and that it was the regular course of such business to make such record at the time of the transactions, occurrences or events recorded therein or within a reasonable time thereafter. A subpoena directing production of such hospital record shall be served not less than twenty-four hours before the time for production, provided such subpoena shall be valid if served less than twenty-four hours before the time of production if written notice of intent to serve such

of that ruling. The defendant offers no reasons, therefore, for overturning the trial court's rulings regarding those documents.

## III

The defendant next claims that two hearsay statements by a third party, Michael Cardwell, should have been admitted into evidence. The defendant had sought to introduce the statements under the hearsay exception for declarations against penal interest. The trial court ruled, however, that he had not established that Cardwell was unavailable. On appeal, the defendant mounts a two part challenge to the trial court's ruling claiming that: (1) as a constitutional matter, the statements were admissible as part of his right to present evidence of third party guilt, which, he maintains, did not require him to establish Cardwell's unavailability; and (2) as an evidentiary matter, the trial court abused its discretion in ruling that Cardwell was not unavailable, and the statements were admissible as a trustworthy declaration against penal interest.

We reject the defendant's constitutional claim that he was entitled to admit the statements irrespective of Cardwell's unavailability. We conclude, moreover, that, even if we were to assume without deciding that the trial court abused its discretion in its ruling on Cardwell's unavailability, the trial court's ruling excluding the statements was proper because, as a matter of law, the defendant failed to establish that the statements overcame the hurdle of three levels of hearsay.

The defendant sought to introduce the report of Detective Vaughn Maher of the New Haven police department. The report, dated November 24, 1990, stated that during the week of November 11, 1990,

subpoena has been delivered to the person in charge of the record room of such hospital not less than twenty-four hours nor more than two weeks before such time for production."

Maher had met with an informant who, Maher had been advised by Lieutenant Francisco Ortiz of the New Haven police department, had worked with Ortiz for several years and had given reliable and accurate information relative to homicides, robberies, burglaries and narcotics offenses that had resulted in arrests and convictions. According to the report, the informant stated that during the week of October 21, or October 28, 1990, he had had a discussion with a "male well known to him as Michael Caldwell,"[10] whose street name was "Bullet." The informant stated that "he has been an associate of Cardwell for several years," and identified a police photograph of Cardwell.

According to the informant, Cardwell had told the informant that Cardwell had killed Turner and Fields. Specifically, the informant related that Cardwell claimed to have gone to the apartment on Howard Avenue along with his brother, Vincent Cardwell, whom the informant also identified from a police photograph. Further, the informant stated, Cardwell claimed that: when he and his brother arrived at the apartment, Vincent stayed outside to signal with a whistle when there was no activity on the street; Cardwell was then let into the apartment by ringing the doorbell and being buzzed in; the second floor apartment door was open; Cardwell walked into the apartment, where he found Turner awake in the bedroom and Fields asleep in the bed; he then fired five shots, killing Turner first and then Fields; and he then fled with Vincent.[11]

---

[10] Although the informant referred to the declarant as Caldwell, rather than Cardwell, we attach no significance to that minor discrepancy, and we refer to the declarant as Cardwell.

[11] The informant also stated that Cardwell was then living at the Three Judges Motel on Whalley Avenue in New Haven, and that Cardwell's father, Arnold Spears, and Vincent Cardwell were "still selling narcotics in the Congress Avenue and Arch Street area." These statements were corroborated by Maher in some respects. He determined that a Cardwell family had rented a room at the motel in late October, and that Cardwell had rented a room at another motel nearby on Whalley Avenue on various dates between

Maher's report also recounted a second statement purportedly made by Cardwell to the informant during the week of November 18, 1990. According to the informant, Cardwell told the informant that Cardwell had killed Turner "because [Turner] did him wrong."[12]

The trial court held a hearing in the absence of the jury on the defendant's claim for the admission of Maher's report into evidence. In support of that claim, the defendant took the following steps.

First, he produced Lieutenant Ortiz, who testified to the standard procedures of the police department for the registry and use of known and reliable informants. Ortiz testified that once an informant was determined to be reliable, he would be registered with an informant number that would identify him and that would be used in lieu of his name. Ortiz also testified that if a registered informant produced "bad information," his file would be "flagged" to indicate that he was not reliable.[13] Ortiz

November 1, and November 18. In addition, Maher determined from the New Haven police department's narcotics enforcement unit that Spears was involved in selling narcotics in the Congress Avenue and Arch Street area, and that Spears and Cardwell had been arrested during the past summer for narcotics offenses.

[12] The defendant also sought to introduce a second report written by Maher dated December 4, 1990, in which Maher recounted a conversation that he had had on December 3, 1990, with Detective John Bashta of the criminal intelligence unit of the police department. Bashta told Maher that on December 2, 1990, an informant "told [Bashta] that the word on Congress Avenue was that an individual, known only as 'Bullet' to the informant, was responsible for the deaths of Turner and Fields." The informant described Bullet and stated that he was involved in the sale of narcotics in the Congress Avenue area. Maher determined that the description of Bullet was consistent with that of Cardwell.

Although the defendant includes this evidentiary ruling under this claim, there is no basis for admission of this statement by the informant under the declaration against penal interest exception to the hearsay rule or any other such exception. The statement does not purport to be a declaration by Cardwell, against his penal interest or otherwise. For that reason alone, the trial court's ruling on this offer was proper.

[13] Although Ortiz did not testify that the informant's file had not been so flagged, the defendant in argument to the trial court asserted that the records

also testified that during the week of November 11, 1990, he was contacted by a registered informant who claimed to have information regarding the murders of Turner and Fields. Ortiz arranged for the informant to be interviewed by Maher, who was the primary investigator on the case. Ortiz also testified that the department's last contact with the informant was during the investigation of these murders. Ortiz testified further that he knew the name of the informant, that during the trial of Morant for the same murders approximately one year previously, Ortiz had confirmed the name and last known address of the informant, that he would be willing to do the same in this case if ordered by the court, and that the informant had not been located or presented during Morant's trial but that he "might . . . still live in New Haven." Finally, Ortiz established that Maher had retired from the department and lived out of state.[14]

The defendant also presented a subpoena that he had attempted to serve on Cardwell at his last known address bearing a return notice that Cardwell could not be located. Moreover, the defendant's counsel made the following offer of proof regarding the defendant's further efforts to locate Cardwell. The counsel offered to prove, through his own testimony, the testimony of Emma Jones, who had been assisting him as a volunteer on the case, and the testimony of a former New Haven police matron who had attempted to serve the subpoena, that: the defendant had been diligently searching for Cardwell since the case had been called for trial; the defendant had investigated "all of the last known haunts of [Cardwell]"; from "word on the street and

indicated that "[the informant] wasn't flagged," and the state did not contest that characterization. Our examination of the file, which was made a court exhibit, supports that assertion.

[14] In addition, the defendant reminded the trial court that during jury selection the state had informed the venirepersons that Maher lived in Florida.

talking to people," the defendant had been "trying to find [Cardwell] without success"; the defendant had "done everything that anybody could think of doing to try and locate [Cardwell]"; and that "nobody has heard from [Cardwell], not just in the last few days, not just in the last couple of weeks, but that in fact he has been an unknown quantity in [New Haven]" for approximately four years. Further, defense counsel represented that he had discovered the address listed on the subpoena "as a result of an investigation at Yale-New Haven Hospital that . . . showed [an address] for [Cardwell] in some of their records." In addition, the defendant had subpoenaed the New Haven police department's entire file on Cardwell. The trial court unsealed the file, which disclosed the addresses of Cardwell that the defendant had unsuccessfully investigated, but no others.

On the basis of these facts, the defendant claimed that Cardwell's statements, as recounted in Maher's report, should be admitted into evidence as a declaration against penal interest.[15] The defendant argued that:

---

[15] We reject the state's contention on appeal that we should not review this evidentiary claim of the defendant because at trial he had claimed that the evidence was admissible, not under the penal interest hearsay exception, but under the so-called "catch-all" or residual hearsay exception. It is true that in the course of his argument to the trial court, the defendant also referred to that exception as supporting his claim of admissibility. In introducing that claim, however, the defendant argued that the question was governed by *State* v. *Gold*, 180 Conn. 619, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980), and *State* v. *DeFreitas*, 179 Conn. 431, 426 A.2d 799 (1980), both of which are cases involving the penal interest hearsay exception. In addition, the state had filed a memorandum of law with the trial court acknowledging that Cardwell's statements were being "offered under the declaration against penal interest exception to the hearsay rule," and urged, both in its memorandum and in oral argument to the trial court, that the case was controlled by *State* v. *Rivera*, 220 Conn. 408, 599 A.2d 1060 (1991), another case involving the penal interest hearsay exception. Contrary to the state's contention, therefore, the defendant does not seek review on the basis of a ruling that was not presented to the trial court. Furthermore, except for the content of the hearsay statement, which is not at issue in the present case, the foundation requirements for both

(1) Cardwell was unavailable, and that the defendant had exercised due diligence to locate Cardwell; and (2) the statements were trustworthy.[16] The state contended that the defendant had not sufficiently established: (1) Cardwell's unavailability; and (2) the trustworthiness of his statements.[17]

hearsay exceptions—unavailability and trustworthiness—are essentially the same. Compare *New England Savings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 753–54, 680 A.2d 301 (1996) (residual hearsay exception), with *State* v. *Rivera*, supra, 411 (penal interest hearsay exception).

[16] With respect to the trustworthiness of Cardwell's statements to the informant, the defendant contended that: (1) the statements had been made "to an acquaintance, not to some police officer"; (2) the statements were made shortly after the shooting; (3) the statements were highly incriminating to Cardwell, who was the declarant; and (4) the statements were purportedly corroborated by the information given to Detective John Bashta by *his* informant. See footnote 12 of this opinion. In addition, there was some internal corroboration, in that the general description of the killing contained in the statements was consistent with some of the other evidence.

With respect to the informant's trustworthiness, the defendant relied on the facts that: (1) the informant had been registered with the police as a reliable informant; and (2) the statements were purportedly corroborated by Bashta's informant.

In addition, the defendant recognized that his offer of this evidence involved various levels of hearsay. Anticipating this problem, he asserted that with respect to Maher, it was solved because he was unavailable and his report was an "official record." With respect to the informant, the defendant asserted that although the informant's name and last known address were available through Ortiz, the informant was unavailable because he could not be located.

[17] With respect to the trustworthiness of Cardwell's statements, the state argued that: (1) there was no evidence of a close relationship between Cardwell and the informant; (2) the statements were not sufficiently corroborated; (3) the statements contained multiple levels of hearsay; and (4) subsequent to these statements, Cardwell gave another statement to the New Haven police department in which he denied any involvement in the murders and denied making any such statements to the informant. In this connection, the trial court examined the transcript of Cardwell's statement made on March 18, 1991, to Detective Vincent Raucci. The court also examined a subsequent report of Maher, dated March 27, 1991, in which he recounted other contacts with the informant, subsequent to the initial two contacts, in which the informant proved unreliable, both as to the lack of substantiation available for his assertions and as to his claims of further meetings with Cardwell. Maher concluded that "the informant could be not viewed as reliable as it was apparent . . . that his interest [lay] mainly in whatever

The trial court assumed, for purposes of its ruling, that the defendant could establish the truth of his counsel's offer of proof. Nonetheless, the court sustained the state's objection on the sole ground that the defendant had not sufficiently established that Cardwell was unavailable.[18]

We first address the defendant's claim that the trial court's ruling excluding Cardwell's statements, irrespective of Cardwell's availability, violated his federal constitutional right to present a defense *because the excluded evidence constituted evidence of the guilt of a third party*. The defendant contends that his "constitutional right to present evidence of third party guilt (as opposed to an *evidentiary* basis for admissibility) did *not* require him to establish Cardwell's unavailability. This is because evidence which tends to show that a third party is actually guilty of the crimes charged is evidence exculpatory of the defendant." (Emphasis in original.) The defendant asserts further that the only limitation on this rule is that the evidence must directly connect the third party with the crime, and "[o]nce such a direct connection has been shown, it is reversible error for the court to refuse the evidence." We disagree.

We first note that the defendant did not make this broad claim in the trial court. He may only prevail on this claim, therefore, under the rubric of *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[19] His claim

financial gain he could obtain by leading us on with information that could not be corroborated or substantiated."

[18] Although the trial court expressed reservations about the trustworthiness of the statements, the court specifically declined to rule on that aspect of the offer and objection.

[19] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond

founders, however, on the third prong of *Golding* requiring him to establish that a constitutional violation exists. Id., 240.

In essence, the defendant argues that any hearsay evidence that, if believed, would be exculpatory of the defendant is constitutionally required to be admitted irrespective of·whether it is admissible under the rules of evidence regarding hearsay, and irrespective of any considerations of necessity or trustworthiness that those rules embody. We know of no reason, policy or authority, and the defendant offers none, for such a broad proposition. The constitutional right to present a defense, which includes, under appropriate limitations, the right to present evidence of third party culpability; *Chambers* v. *Mississippi*, 410 U.S. 284, 298–303, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); does not require that any evidentiary limitation on the admissibility of evidence, no matter how sound as a matter of policy, must yield. Id., 302. "[I]n the exercise of his sixth amendment right [to defend himself] the accused, as required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (Internal quotation marks omitted.) *State* v. *Stange*, 212 Conn. 612, 625, 563 A.2d 681 (1989). One of the factors determining the fairness of permitting a defendant to introduce exculpatory evidence is whether the declarant is unavailable. See *State* v. *Lopez*, 239 Conn. 56, 74, 681 A.2d 950 (1996) ("[r]equiring that the unavailability of the declarant be established in order to admit a hearsay statement fulfills the necessity factor that is part of any exception to the hearsay rule"); *State* v.

a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

*DeFreitas*, 179 Conn. 431, 449, 426 A.2d 799 (1980) ("*Chambers* holds that trustworthy third party declarations against penal interest which exculpate the accused and are critical to his defense cannot be excluded as hearsay in mechanical fashion *when the declarant is unavailable for cross-examination*" [emphasis added]). We, therefore, reject the defendant's argument that any exculpatory evidence should be admitted regardless of the declarant's availability.

The defendant next claims that as an evidentiary matter, the trial court abused its discretion in ruling that he had failed to establish Cardwell's unavailability for purposes of the hearsay exception for declarations against penal interest. The defendant also claims that "the record . . . supports the [statements'] trustworthiness." We need not decide in this case whether the trial court abused its discretion in its ruling on Cardwell's unavailability, or whether, after assuming the offer of proof by defendant's counsel to be true, the trial court should have required an evidentiary hearing based on that offer of proof. Even if we were to assume without deciding that Cardwell's statements were admissible as declarations against penal interest and that the police report was admissible under the business record exception to the hearsay rule, we conclude that the defendant has failed to establish the unavailability of the informant and the trustworthiness of the informant's statements to Detective Maher under the residual hearsay exception, which is the only hearsay exception arguably applicable to the informant's statements. Thus, we affirm the trial court's ruling on grounds different from those relied on by the trial court.[20] See *State* v. *DeFreitas*, supra, 179 Conn. 449–55.

---

[20] We note in this connection that although the state on appeal suggested that if we were to reach the issue of the statements' trustworthiness, the case should be remanded to the trial court, there is no need for such a remand because the defendant has fully briefed the question, the issue was

In order to conclude that the trial court improperly failed to admit Maher's report into evidence, the defendant must overcome three levels of hearsay. When a statement is offered that contains hearsay within hearsay, each level of hearsay must itself be supported by an exception to the hearsay rule in order for that level of hearsay to be admissible. See *State* v. *Williams*, 231 Conn. 235, 249, 645 A.2d 999 (1994); *State* v. *Milner*, 206 Conn. 512, 521, 539 A.2d 80 (1988); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988 & Sup. 1998) § 11.14.5, pp. 389, 229–30; 2 C. McCormick, Evidence (4th Ed. 1992) § 324.1, pp. 368–70. Cardwell's statements to the informant, the informant's statements relating this information to Detective Maher, and Maher's report each constitute hearsay because neither Cardwell, the informant, nor Maher was present in court to testify and the report, along with all statements contained therein, was offered to prove the truth of the matters asserted. See *State* v. *Sharpe*, 195 Conn. 651, 661, 491 A.2d 345 (1985). In resolving this issue, we will assume without deciding that Cardwell's statements to the informant were admissible as declarations against penal interest.[21] We will also assume without deciding

fully argued in the trial court, and the trial record is complete. See *State* v. *Lopez*, supra, 239 Conn. 74.

[21] "The law regarding the admissibility of third party statements against interest is well settled. A *trustworthy* third party statement exculpatory of the accused and against the penal interest of the declarant is admissible at the trial of the accused if the declarant is unavailable. *State* v. *Boyd*, 214 Conn. 132, 138, 570 A.2d 1125 (1990); *State* v. *Mayette*, 204 Conn. 571, 576, 529 A.2d 673 (1987); *State* v. *Hernandez*, 204 Conn. 377, 389–90, 528 A.2d 794 (1987); *State* v. *Bryant*, 202 Conn. 676, 692, 523 A.2d 451 (1987); *State* v. *Gold*, 180 Conn. 619, 630, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *DeFreitas*, [supra, 179 Conn. 450–51]; see also Fed. R. Evid. 804 (b) (3). The determination of whether such a statement is sufficiently trustworthy to be admitted into evidence at trial lies within the sound discretion of the trial court. *United States* v. *Hoyos*, 573 F.2d 1111, 1115 (9th Cir. 1978); *State* v. *Mayette*, supra, 577; *State* v. *Hernandez*, supra, 390; *State* v. *Bryant*, supra, 694; *State* v. *DeFreitas*, supra, 452.

"Our present rule allowing the admission of trustworthy third party statements against penal interest has its genesis in *Chambers* v. *Mississippi*,

that the police report was admissible under the business record exception to the hearsay rule.[22] Because the defendant has not proven and the trial record does not support the admissibility of the informant's relation of

[supra, 410 U.S. 284]. Prior to *Chambers*, such third party statements were per se inadmissible as hearsay. *State* v. *Stallings*, 154 Conn. 272, 287, 224 A.2d 718 (1966); *State* v. *Mosca*, 90 Conn. 381, 387, 97 A. 340 (1916); *State* v. *Beaudet*, 53 Conn. 536, 551, 4 A. 237 (1886). In *State* v. *DeFreitas*, supra, [179 Conn. 449], we interpreted *Chambers* as forbidding the mechanistic application of the hearsay rule to exclude all third party statements against penal interest exculpatory of an accused. We concluded, however, that *Chambers* did not mandate the admission of every such statement but required the admission only of those statements that, after a careful examination, were determined in the sound discretion of the trial court to be trustworthy. *State* v. *DeFreitas*, supra, 451–52.

"Four considerations have been deemed relevant when examining the trustworthiness of declarations against penal interest: (1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; [and] (4) the availability of the declarant as a witness. *United States* v. *Guillette*, 547 F.2d 743, 754 (2d Cir. [1976]), cert. denied, 434 U.S. 839, 98 S. Ct. 132, 54 L. Ed. 2d 102 [1977]. See *United States* v. *Oropeza*, 564 F.2d 316, 325 (9th Cir. [1977]) [cert. denied, 434 U.S. 1080, 98 S. Ct. 1276, 55 L. Ed. 2d 788 (1978)]; *Henson* v. *United States*, 399 A.2d 16 [19] (D.C. App.) [cert. denied, 444 U.S. 848, 100 S. Ct. 96, 62 L. Ed. 2d 62 (1979)]; *People* v. *Foster*, 66 Ill. App. 3d 292, 294–95, 383 N.E.2d 788 [1978]. *State* v. *DeFreitas*, supra, [179 Conn. 451]; *State* v. *Bryant*, supra, [202 Conn. 693]; *State* v. *Frye*, 182 Conn. 476, 479, 438 A.2d 735 (1980); *State* v. *Gold*, supra, [180 Conn. 633]." (Emphasis in original; internal quotation marks omitted.) *State* v. *Lopez*, supra, 239 Conn. 70–72; *State* v. *Rosado*, 218 Conn. 239, 243–45, 588 A.2d 1066 (1991).

The informant's statements to Detective Maher, which recount Cardwell's statements, were not admissible as declarations against penal interest because they were not declarations against the penal interest of the informant. Instead, they were statements against the penal interest of Cardwell.

[22] The business records exception to the hearsay rule, General Statutes § 52-180, provides in pertinent part: "Admissibility of business entries and photographic copies. (a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the

Cardwell's statements to Detective Maher, however, the trial court properly ruled that the police report was inadmissible.[23]

If, therefore, the trial court had ruled incorrectly on the issue of Cardwell's unavailability, and if the trial record was sufficient for the trial court to have exercised its discretion and found the statements offered to have been sufficiently trustworthy to be presented

writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility. . . ."

To admit evidence under the business records exception to the hearsay rule, three conditions must be satisfied: (1) the record was made in the regular course of business; (2) it was in the regular course of such business to make such a record; and (3) it was made at the time of the act described in the report or within a reasonable time thereafter. *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, 219 Conn. 787, 793–94, 595 A.2d 839 (1991). Even if we were to assume that Maher's report qualified generally under the statutory business records exception to the hearsay rule, that does not mean that all statements included in a business record are themselves admissible. Id., 794. While police reports are normally admissible under the business records exception to the hearsay rule, statements of witnesses repeated in the report do not fall within this exception. *Hutchinson* v. *Plante*, 175 Conn. 1, 4–5, 392 A.2d 488 (1978). Only those statements of third parties in such a record that the declarant has a duty to make are themselves admissible as part of the business record. Id., 5; *State* v. *Milner*, supra, 206 Conn. 521. "If the information does not have such a basis, it adds another level of hearsay to the report which necessitates a separate exception to the hearsay rule in order to justify its admission." *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, supra, 794; *In re Barbara J.*, 215 Conn. 31, 40, 574 A.2d 203 (1990). It cannot be maintained, however, that the informant was under a legally cognizable duty to make such statements. Thus, the defendant's claim in the trial court, namely, that Maher's report was sufficient to bring into evidence the informant's statements contained within it because it was an "official record"; see footnote 16 of this opinion; was flawed.

[23] A trial court's ruling on the admissibility of evidence is entitled to great deference and will be overturned only if a clear abuse of the court's discretion is shown and the defendant shows that the ruling caused substantial prejudice or injustice. An appellate tribunal is required to make every reasonable presumption in favor of upholding the trial court's ruling. *State* v. *Hines*, 243 Conn. 796, 801–802, 709 A.2d 522 (1998).

to the jury, we would remand the case to the trial court for it to consider the matter and to exercise its discretion. In this case, however, the trial record makes clear that the statements could not be found to be sufficiently trustworthy for admission because the record could not support a proper determination for admission of such statements. Thus, hearsay evidence excluded upon an improper ground may nonetheless be "properly excluded if no ground existed for its admission for the truth of the matter asserted therein." *State* v. *DeFreitas*, supra, 179 Conn. 450.

It is well established that all hearsay exceptions are rooted in the notion that they contain a sufficient guarantee of trustworthiness to serve as a sufficient surrogate for cross-examination of testimony in court. *Chambers* v. *Mississippi*, supra, 410 U.S. 298–99; *State* v. *Stange*, supra, 212 Conn. 625. "The 'residual,' or 'catch-all,' exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is 'a reasonable necessity for the admission of the statement,' and (2) the statement is 'supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions.' . . . We have stated that 'the necessity requirement is met when, unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead or *otherwise unavailable*, or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources.' " (Citations omitted; emphasis in original.) *State* v. *Oquendo*, 223 Conn. 635, 664–65, 613 A.2d 1300 (1992). Application of these propositions to the facts of the present case compels the conclusion that Maher's report could not, in the proper exercise of the trial court's discretion, have been admitted.

The informant's statements do not satisfy the requirements of admission under the residual exception to the hearsay rule. Contrary to the defendant's assertion in the trial court; see footnote 16 of this opinion; he did not show that the informant was unavailable. The defendant could have obtained the informant's name and last known address from Ortiz, and the sole fact that the informant had not been produced by the defense in Morant's trial one year previously, after having learned the informant's name and address, falls far short of establishing that reasonable efforts to locate him for this trial; see *State* v. *Lopez*, supra, 239 Conn. 75; would have been unsuccessful. The record is bereft of any evidence regarding what efforts, if any, Morant made at that time, and regarding any efforts by this defendant to locate the informant for this trial.

In addition, the evidence before the trial court could not support a finding of the trustworthiness of the statements. Contrary to the defendant's assertion, there was insufficient evidence of any close relationship between the informant and Cardwell so as to suggest that Cardwell would have confided in the informant that Cardwell had killed the victims. The only evidence of their relationship was that the person known as "Bullet" was "well known to [the informant] as Michael Caldwell,"[24] and that "[the informant] has been an associate of Cardwell for several years."[25] Moreover, whatever trustworthiness value there might have been in Ortiz' description of the informant as "reliable" was minimal at best, and in Ortiz' testimony permitting the inference that his

---

[24] Thus, we do not know from this characterization whether this meant that Cardwell was "well known" to the informant in the sense of being a close friend, or whether Cardwell was simply "well known" to the informant by his name in the sense that the informant well knew his name to be Michael Cardwell.

[25] Thus, we do not know what kind of association—business, social, criminal, or some combination of the three—the informant and Cardwell enjoyed, nor how close that association was.

name had not been flagged as unreliable; see footnote 13 of this opinion; was undermined by Maher's subsequent report indicating that at least insofar as this case was concerned, the informant was unreliable. See footnote 17 of this opinion.

Furthermore, although there is some corroboration of some of the information conveyed by the informant's statements, the elements of corroboration—whether viewed individually or collectively—fall short of clearly indicating the trustworthiness of the statements. The fact that the informant accurately conveyed where Cardwell was living at the time of the killings, that the informant knew of Cardwell's and his father's drug activity, and that, according to Detective John Bashta's informant, the "word on the street" was that Cardwell was the killer, add very little to the trustworthiness of the statements. The most telling corroboration is that the informant's statements of how Cardwell purportedly described the criminal episode corresponded generally to the facts of the episode. That corroborating effect is undermined, however, by the absence of any evidence that this information had been undisclosed by the police and could not or would not have been generally known in the area.

Finally, the defendant's reliance on Ortiz' characterization of the informant as a "reliable informant" is wholly misplaced because of the difference between, on the one hand, the concept of trustworthiness in relation to the residual hearsay exception, which operates in the trial setting, and, on the other hand, the concept of a reliable informant, which operates in the investigation and probable cause settings. If a statement is determined to be trustworthy under the residual hearsay exception, that means that the trial court is satisfied that it should be heard by the jury, despite the lack of opportunity by the opponent of the statement to cross-examine the declarant. That determination reflects a

judgment *by the court* that its trustworthiness is sufficiently established so as to serve as an adequate surrogate for that right of cross-examination, and that, therefore, the question of guilt or innocence ought not to be adjudicated without the statement as evidence. Such a determination, therefore, is part of the evidentiary gatekeeping function of the trial court and bears directly on the fact-finding function of the jury.

The use of informants, however, serves very different functions. In the first instance, it is part of the investigatory function of the police. A determination that an informant is "reliable" is made *by the police*, not by any court, as part of that function. Its use as part of the judicial process is principally to serve as one of the bases on which a court may rely in determining whether there is probable cause for the issuance of a warrant. See *State* v. *Barton*, 219 Conn. 529, 544–45, 594 A.2d 917 (1991) (court may rely on knowledge obtained by informant in probable cause ruling). Evidence is not required to rise to a significant level of trustworthiness in order to meet the probable cause standard. See *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992) ("[t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction" [internal quotation marks omitted]). Ordinarily, it plays no role as a surrogate for the right of cross-examination or in the ultimate fact-finding process by the jury.[26]

---

[26] Indeed, one can easily surmise the defendant's reaction to this same issue if, instead of the defendant seeking to introduce the purportedly "reliable" but unavailable informant's hearsay statements that Cardwell had inculpated himself, it had been the state seeking to introduce the same informant's hearsay statements that the *defendant* had admitted to the informant that the defendant had killed the victims. If we were to accept the defendant's contention, namely, that a police determination of the "reliability" of an informant is enough for a trial court to determine, for purposes of a hearsay exception, that the informant's hearsay statement is "trustworthy," it would also open criminal trials to that kind of evidence from the state. We do not believe that hearsay exceptions are designed to stretch that far.

Therefore, because the record does not support the admissibility of each of three levels of hearsay necessary to admit Maher's report into evidence, the trial court did not abuse its discretion in excluding Maher's report. The multiple levels of hearsay, the lack of independent bases for the admissibility of hearsay statements within hearsay statements, and the lack of any other sufficient indicia of trustworthiness, rendered the report insufficient to serve as an adequate surrogate for cross-examination so as to permit the report to be part of the determination of the guilt or innocence of the defendant.

## IV

The defendant next claims that the trial court improperly failed to charge the jury on self-defense in violation of his fundamental due process rights under the federal and state constitutions,[27] which guarantee his right to present a defense. At trial, the defendant submitted a written request for a jury instruction on the issue of self-defense. The trial court rejected the defendant's request and omitted any instruction relating to self-defense, to which the defendant excepted. The state argues that a self-defense instruction was not warranted because the defendant did not provide sufficient evidence to raise a reasonable doubt in the mind of a rational juror as to whether he acted in self-defense, and because a person who commits a robbery with force and kills his intended victim, who purportedly responds with force, is not entitled to a self-defense instruction. We conclude that, as a matter of law, the defendant was not entitled to a self-defense instruction under the facts of this case.

[27] Because the defendant has failed to provide an independent and adequate state constitutional analysis, we will address only his claim alleging a violation of his federal constitutional rights. *State* v. *Genotti,* 220 Conn. 796, 811–12, 601 A.2d 1013 (1992); *State* v. *Perez,* 218 Conn. 714, 723, 591 A.2d 119 (1991); see footnote 6 of this opinion.

"The legal principles applicable to the defendant's claim are well established. [T]he fair opportunity to establish a defense is a fundamental element of due process of law . . . . *State* v. *Carter*, 228 Conn. 412, 427, 636 A.2d 821 (1994), quoting *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. See General Statutes § 53a-12 (a). *State* v. *Miller*, 186 Conn. 654, 660–61, 443 A.2d 906 (1982); see also *State* v. *Carter*, 232 Conn. 537, 545, 656 A.2d 657 (1995). Thus, [i]f the defendant asserts [self-defense] and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to [an] . . . instruction [on self-defense]. *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986). Before an instruction is warranted, however, [a] defendant bears the initial burden of producing sufficient evidence to inject self-defense into the case. . . . To meet that burden, the evidence adduced at trial, whether by the state or the defense, must be sufficient [if credited by the jury] to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense. . . . *State* v. *Carter*, supra, [232 Conn.] 545. This burden is slight, however, and may be satisfied if there is any foundation in the evidence [for the defendant's claim], no matter how weak or incredible . . . . Id., 546; *State* v. *Fuller*, supra, 278. Furthermore, in reviewing the trial court's rejection of the defendant's request for a jury charge on self-defense, we must adopt the version of the facts most favorable to the defendant which the evidence would reasonably support. . . . *State* v. *Lewis*, 220 Conn. 602, 619, 600 A.2d 1330 (1991).

"Finally, [i]n order sufficiently to raise self-defense, a defendant must introduce evidence that the defendant reasonably believed his adversary's unlawful violence to be imminent or immediate. W. LaFave & A. Scott, Handbook on Criminal Law (1972) § 53, p. 394. Under General Statutes § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force if he reasonably believes both that his attacker is using or about to use deadly force against him and that deadly force is necessary to repel such attack. . . . The Connecticut test for the degree of force in self-defense is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. . . . *State* v. *Carter*, supra, 232 Conn. 545–46." (Internal quotation marks omitted.) *State* v. *Edwards*, 234 Conn. 381, 388–89, 661 A.2d 1037 (1995). Moreover, the evidence must be such that the jury must not have to resort to speculation in order to find that the defendant acted in justifiable self-defense. *State* v. *Carter*, supra, 549.

The only evidence arguably supporting the defendant's claim of self-defense was Ruiz' testimony that after he asked the defendant what had happened in the apartment, the defendant responded, "I had to protect myself, he pulled a gun out, I had to protect myself," and Ruiz' testimony that the defendant repeated that same statement on other occasions.[28] Even if we were to assume without deciding that this evidence, viewed in the context of all the evidence regarding the killing of the victims, would have permitted a rational jury to find self-defense without resorting to speculation, the defendant was not entitled to an instruction on that

---

[28] Ruiz also testified, however, that when he pressed the defendant regarding what actually had happened in the house, the defendant "said the truth, he didn't pull out no gun. There was no gun involved."

theory of defense because he was engaged in robbing the victims when his purported justification for killing them arose.

In determining whether the defendant is entitled to an instruction of self-defense, we must view the evidence most favorably to giving such an instruction. Under that scenario, the defendant purportedly was confronted by one of the victims threatening him with a gun, after the defendant and Morant had entered the victims' apartment at 4 a.m., armed with guns, in order to rob the victims. "One who commits or attempts a robbery armed with deadly force, and kills the intended victim when the victim responds with force to the robbery attempt, may not avail himself of the defense of self-defense. It has long been accepted that one cannot support a claim of self-defense by a self-generated necessity to kill. The right of homicidal self-defense is . . . denied to slayers who incite the fatal attack. . . . In sum, one who is the aggressor in a conflict culminating in death cannot invoke the necessities of self-preservation. *United States* v. *Peterson*, 483 F.2d 1222, 1231 (D.C. Cir.), cert. denied, 414 U.S. 1007, 94 S. Ct. 367, 38 L. Ed. 2d 244 (1973) . . . see also *Melchior* v. *Jago*, 723 F.2d 486, 493–94 (6th Cir. 1983), cert. denied, 466 U.S. 952, 104 S. Ct. 2156, 80 L. Ed. 2d 542 (1984); *People* v. *Guraj*, 105 Misc. 2d 176, 431 N.Y.S.2d 925, 927 (N.Y. Sup. Ct. 1980); N.Y. Penal Law, § 35.15 (1) (b) McKinney (1988)." *United States* v. *Thomas*, 34 F.3d 44, 48 (2d Cir.), cert. denied, 513 U.S. 1007, 115 S. Ct. 527, 130 L. Ed. 2d 431 (1994); see *State* v. *Joyce*, 45 Conn. App. 390, 402, 696 A.2d 993, cert. granted, 243 Conn. 904, 701 A.2d 336 (1997) (jury instructed that self-defense did not apply if jury "was convinced that the defendant was in the process of robbing the store and that the defendant had killed the victim"); see also *State* v.

*Lewis*, supra, 220 Conn. 620 ("[t]he defense of self-defense does not encompass a preemptive strike").[29] "Under this principle, the [defendant] had no entitlement to any self-defense charge." *United States* v. *Thomas*, supra, 48. "[A] person is not justified in using physical force when . . . he provokes the use of physical force by [the] other person" or when "he is the initial aggressor" and does not "[withdraw] from the encounter and effectively [communicate] . . . his intent to do so . . . ." General Statutes § 53a-19 (c). Even viewing the facts in a light most favorable to the defendant, we conclude that because when the purported justification for killing the victims arose the defendant was the initial aggressor by having entered the victims' apartment armed with guns and with a motive to steal drugs and drug money, he was not entitled to an instruction on self-defense.

V

The defendant's fifth claim is that the trial court improperly refused to deliver a missing witness instruction in accordance with *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 672. The defendant argues that the jury should have been allowed to draw an adverse inference from the state's failure to call Detective Vincent Raucci, who was one of the lead investigators on the case and who had interrogated Ruiz, Roque and Morant. We are not persuaded.

"The failure to produce a witness for trial who is available and whom a party would naturally be expected to call warrants an adverse inference instruction against

---

[29] "[T]he right to claim self-defense may be forfeited by one who commits an armed robbery, even if excessive force is used by the intended victim or by any person intervening to prevent the crime or apprehend the robber. *Wilson* v. *State*, 473 P.2d 633, 636 ([Alaska] 1970). See *People* v. *Dillard*, 5 Ill. App. 3d 896 [284 N.E.2d 490] (1972) (robber has no right to kill his victim to save his own life)." *Commonwealth* v. *Maguire*, 375 Mass. 768, 773, 378 N.E.2d 445 (1978).

the party who would be expected to call that witness." *State* v. *Santangelo*, 205 Conn. 578, 596, 534 A.2d 1175 (1987); *State* v. *Anderson*, 212 Conn. 31, 41, 561 A.2d 897 (1989). "[T]he two requirements for a *Secondino* adverse inference instruction against a party are that the witness: (1) is available; and (2) could reasonably be expected, by his relationship to the party or the issues, to have peculiar or superior information material to the case that, if favorable, the party would produce." *Hines* v. *St. Vincent's Medical Center*, 232 Conn. 632, 641, 657 A.2d 578 (1995) (*Borden, J.*, concurring); *State* v. *Wood*, 208 Conn. 125, 140, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988); *State* v. *Shashaty*, 205 Conn. 39, 43, 529 A.2d 1308 (1987), cert. denied, 484 U.S. 1027, 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988); *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 675. The party seeking the adverse inference instruction bears the burden of proving both prongs of the test, and the trial court must make a preliminary determination that there is evidence in the record to support these elements. *Hines* v. *St. Vincent's Medical Center*, supra, 638.

Whether a party has established the requirements for a *Secondino* instruction is a factual determination that is committed to the sound discretion of the trial court. See *State* v. *Oliver*, 48 Conn. App. 41, 45, 708 A.2d 594 (1998). We will not disturb that discretion unless the failure to give such an instruction amounts to a clear abuse of that discretion. *State* v. *Grant*, 221 Conn. 93, 106, 602 A.2d 581 (1992); *State* v. *Barnes*, 47 Conn. App. 590, 594, 706 A.2d 1000 (1998); see *State* v. *Beckenbach*, 198 Conn. 43, 47, 501 A.2d 752 (1985) (great weight is afforded to decisions of trial court and every reasonable presumption will be made in favor of correctness of court's discretion). We conclude that the trial court did

not abuse its discretion regarding the second of the *Secondino* requirements.[30]

The defendant argues that the second prong of *Secondino* was satisfied because Raucci was "an employee of the police department, aligned with the prosecutor and antagonistic to the defense," and because the "repeated disparagement" of Raucci's character by defense witnesses should have compelled him to appear to rebut those statements. The issue before the trial court and the jury, however, was whether the defendant committed the crimes with which he was charged, not Raucci's character. Furthermore, the defendant did not establish that Raucci could have provided any peculiar or superior information about the crimes than was already in evidence. Raucci did not conduct the investigation alone; other police officers also participated in the investigation, some of whom testified at the trial. Therefore, the trial court did not abuse its discretion in determining that Raucci's testimony would have been cumulative, and that his presence was unnecessary. "A possible witness whose testimony is for any reason comparatively unimportant, cumulative or inferior to what has been offered should be dispensed with on the general ground of expense and inconvenience, without anticipation that an [adverse] inference may be invoked." (Internal quotation marks omitted.) *State* v. *Carrione*, 188 Conn. 681, 688, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983).

## VI

The defendant also claims that the trial court improperly instructed the jury regarding reasonable doubt, thereby diluting the standard of proof in violation of his right to due process under the federal and state

---

[30] It is unnecessary, therefore, to consider whether the defendant established Raucci's unavailability.

constitutions. The defendant challenges the following portion of the jury instructions: "[A reasonable doubt] is one for which you can in your own mind conscientiously give a reason. A reasonable doubt is a square and honest doubt grounded on reason, one which appeals to reason. If the facts you may find proven or the evidence you deem credible are subject to two possible interpretations as to the defendant's guilt or innocence, you may choose the interpretation that you find reasonable and logical. . . . A reasonable doubt is a doubt for which a valid reason can be assigned."[31] Although the defendant concedes that we have previously upheld

---

[31] The trial court's entire instruction to the jury regarding reasonable doubt provided:

"You've heard reference to the expression, burden of proof. The burden is upon the state to prove the accused guilty of the crime with which he is charged beyond a reasonable doubt. The accused does not have to prove his innocence. That means that the state must prove every element necessary to constitute the crime charged against the accused as I shall explain these elements to you.

"It is not enough that the state proves certain of these elements for if proof of even one is lacking, you must find the accused not guilty. The state has sustained the burden of proof resting upon it only if the evidence before you establishes the existence of every element constituting the crime charged against the accused beyond a reasonable doubt.

"In order to establish the guilt of the accused beyond a reasonable doubt the proof must exclude every reasonable presumption or hypothesis of innocence in the minds of each juror, for proof beyond a reasonable doubt is such proof as excludes every reasonable hypothesis of innocence.

\* \* \*

"What is a reasonable doubt? A reasonable doubt is not such a doubt as may be raised by someone questioning for the sake of raising a doubt. It is not a surmise or a guess or a conjecture. It is not hesitation springing from feelings of sympathy or pity for the accused or members of his family or anybody else that might be affected by your verdict, and of course you will remember that sympathy should play no part in your deliberations, nor should the punishment of an accused upon conviction be any part of your deliberations.

"A reasonable doubt is one founded upon the evidence, one which grows out of the evidence or want of evidence in the case. It is one for which you can in your own mind conscientiously give a reason. A reasonable doubt is a square and honest doubt grounded on reason, one which appeals to reason. If the facts you may find proven or the evidence you deem credible

these instructions in *State* v. *Kelley*, 229 Conn. 557, 567, 643 A.2d 854 (1994), he argues that we should reconsider that decision. Because the defendant does not offer any reason to depart from our previous decisions approving such an instruction under both the federal and the state constitutions, we decline to do so.

"We have consistently upheld, against claims of constitutional error, the definition of a reasonable doubt as 'a doubt for which a valid reason may be assigned.' See, e.g., *State* v. *Adams*, 225 Conn. 270, 290–91, 623 A.2d 42 (1993); *State* v. *Derrico*, 181 Conn. 151, 170–71, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)." *State* v. *Kelley*, supra, 229 Conn. 567–68; see *State* v. *Chance*, 236 Conn. 31, 63, 671 A.2d 323 (1996). We have also "concluded that these

are subject to two possible interpretations as to the defendant's guilt or innocence, you may choose the interpretation that you find reasonable and logical.

"The state is not required however absolutely to demonstrate the guilt of the accused. Proof beyond a reasonable doubt does not require proof beyond a possible doubt or proof beyond the shadow of a doubt or proof to a hundred percent certainty. The proof however must be beyond a reasonable doubt and this reasonable doubt is one which reasonably arises from the evidence or want of evidence in the case. Any other doubt than this is not a reasonable doubt.

"This phrase reasonable doubt has no technical or unusual meaning. You can arrive at the real meaning of it by emphasizing the word reasonable. A reasonable doubt is a doubt for which a valid reason can be assigned. . . . It is a doubt which is something more than a guess or a surmise. It is not a conjecture or a fanciful or a capricious doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts nor is it a doubt suggested by the ingenuity of counsel or of a juror which is not warranted by the evidence. A reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or the lack of evidence.

"And of course absolute certainty of course in the affairs of life is almost never attainable and the law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. What the law does require however is that after hearing all of the evidence, if there is something in that evidence or the lack of evidence which leaves in the minds of the jury as reasonable men and women a reasonable doubt of the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted."

definitions of reasonable doubt, when viewed in the context of an entire charge, do not dilute the state's burden of proof." *State* v. *Kelley*, supra, 568; see *State* v. *Hines*, 243 Conn. 796, 818–19, 709 A.2d 522 (1998) (challenged portion of jury instruction viewed in context of instruction in its entirety; "whether the charge as a whole presents the case to the jury so that no injustice will be done"). The trial court's charge in the present case, viewed in its entirety, adequately instructed the jury concerning reasonable doubt and did not dilute the state's burden of proof.

## VII

The defendant's final claim is that his conviction and sentences for both murder and felony murder as to each victim violated the federal constitutional prohibition against double jeopardy.[32] The defendant was sentenced to sixty years imprisonment for the murder of Turner, together with a concurrent sixty year term for the felony murder of Turner, and he also was sentenced to a consecutive sixty year term of imprisonment for the murder of Fields, with a concurrent sixty year term for the felony murder of Fields. The state agrees with this claim, and concedes that the sentences are improper because they violate the double jeopardy clause of the fifth amendment to the United States constitution.

The double jeopardy clause protects against multiple punishments for the same offense in a single trial. *North Carolina* v. *Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969); *State* v. *Lonergan*, 213 Conn. 74, 78–79, 566 A.2d 677 (1989), cert. denied, 496 U.S. 905, 110 S. Ct. 2586, 110 L. Ed. 2d 267 (1990). "An indictment charging an accused with intentional and felony murder

---

[32] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ."

of a particular victim charges a single offense, committed conjunctively in two different ways." *State* v. *Couture*, 194 Conn. 530, 560, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Thus, the defendant could not be convicted for both murder and felony murder as to each victim. The proper remedy is to combine the defendant's convictions for the two counts of felony murder with his convictions for the two counts of intentional murder, and to vacate the felony murder sentences. *State* v. *Chicano*, 216 Conn. 699, 713, 725, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). Accordingly, we will remand the case for such action.

The judgment is reversed in part and the case is remanded to the trial court with direction to combine the defendant's convictions for the two counts of felony murder with his convictions for the two counts of intentional murder, and to vacate the felony murder sentences; in all other respects the judgment is affirmed.

In this opinion the other justices concurred.